*Westminster Management, LLC, et al. v. Tenae Smith, et al.*, No. 4, September Term, 2023.

**LANDLORD-TENANT LAW – RESIDENTIAL LEASES – REAL PROPERTY § 8-401 – MEANING OF RENT**
Real Property Article § 8-401 allows a landlord to pursue the summary ejectment of a tenant from the leased premises upon a tenant's failure to pay "rent." The term "rent" as used in § 8-401 and applied to residential tenants means the fixed, periodic payments a residential tenant must pay for use or occupancy of a rented premises.

**LANDLORD-TENANT LAW – RESIDENTIAL LEASES – REAL PROPERTY §§ 8-208(d)(2) AND 8-401 – PAYMENT ALLOCATION CLAUSES**
Real Property Article § 8-208(d)(2) prohibits clauses in residential leases in which a tenant waives or foregoes any right or remedy provided by applicable law. Inclusion in a residential lease of a "payment allocation clause" that permits the landlord to allocate payments of "rent" to other obligations, and thereby subject a tenant to summary ejectment proceedings based on the failure to pay "rent," violates § 8-208(d)(2).

**LANDLORD-TENANT LAW – RESIDENTIAL LEASES – REAL PROPERTY § 8-208(d)(3)(i) – LATE FEES**
Real Property Article § 8-208(d)(3)(i) prohibits provisions in residential leases that provide for a penalty for the late payment of rent "in excess of 5% of the rent due for the rental period in which the payment was delinquent." The 5% late fee is inclusive of any costs incurred to collect rent other than court costs actually awarded by the court.

**CIVIL PROCEDURE – CLASS ACTIONS – MD. RULE 2-231 – SUBSEQUENT MOTIONS FOR CLASS CERTIFICATION**
In addressing a motion to certify or de-certify a class after a court has ruled on a prior certification motion, a court must determine whether there has been a material change in circumstances, which may include a change in the claims, defendants, evidence, or class definition when those changes materially alter the relevant considerations for class certification. If there has been a material change in circumstances, the court should address the merits of the subsequent motion unless that motion is deficient for other reasons.

Circuit Court for Baltimore City
Case No. 24-C-17-004797
Argued:  November 6, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 4

September Term, 2023

_____


WESTMINSTER MANAGEMENT, LLC, et al.

v.

TENAE SMITH, et al.

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Gould,
Eaves,
Harrell, Glenn T., Jr. (Senior
    Justice, Specially Assigned),

JJ.

_____

Opinion by Fader, C.J.
Gould and Harrell, JJ., concur and dissent.

_____

Filed: March 25, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Maryland statutory law provides a process by which a landlord may obtain an order to evict tenants from leased property if the tenants fail to timely pay their "rent." This process, known as summary ejectment, is unlike any other litigation procedure in Maryland due to the combination of its speed (trial must be held within six days of filing absent unanimous agreement to postpone further), the absence of a requirement of personal service, the lack of opportunity for pretrial discovery, the allowance for one side to be represented in court by non-lawyers, and the short window for appeal (four days), among other factors. As a result, the grounds for invoking the process and the relief available through it are circumscribed. Particularly relevant here, the summary ejectment process: (1) may be invoked only when "the tenant or tenants fail to pay the rent when due and payable," Md. Code Ann., Real Prop. Art. § 8-401(a) (2023 Repl.); and (2) with respect to residential tenancies, may be used only (i) to regain possession of the rented premises and (ii) if (and only if) personal service is made, to recover rent due and unpaid, late fees, and court costs, *id.* § 8-401(a), (e)(2), (e)(3), (f)(1)(i).

The first question presented in this appeal is what constitutes "rent," such that a residential tenant's failure to pay it when due provides grounds for initiating a summary ejectment proceeding. The petitioners, Westminster Management, LLC and its predecessor, JK2 Westminster, LLC (collectively, "Westminster"), contend that the term "rent," as used in the summary ejectment statute, Real Property § 8-401, encompasses whatever a written lease says it encompasses. Here, Westminster's form leases define "rent" as "[a]ll payments from Tenant to Landlord required under the terms of this Lease." Such payments could presumably include, among others: (1) the fixed amount the tenant

is obligated to pay for use or occupancy of the leased premises on a periodic basis; (2) additional fixed periodic charges (e.g., trash collection); (3) additional variable periodic charges (e.g., utility fees); (4) fees charged for late payments or other lease violations; (5) fees paid to a third party agent to initiate summary ejectment proceedings; and (6) filing fees and other court costs.

The respondents, former tenants at residential properties managed by Westminster ("Tenants"),[1] contend that "rent," as used in the summary ejectment statute, is more specific and limited. The Appellate Court of Maryland mostly agreed with the Tenants, as do we. We hold that in the context of residential leases, "rent," for purposes of § 8-401 of the Real Property Article, means the fixed, periodic payments a tenant is obligated to pay for use or occupancy of the leased premises. Provisions of residential leases that purport to expand the definition of "rent" are ineffective for purposes of § 8-401.

The second question before us is the legality of a provision in Westminster leases that permits Westminster to allocate all tenant payments, including those expressly designated as "rent," to other, non-"rent" obligations. We hold that such an allocation provision violates the prohibition in Real Property § 8-208(d)(2) against requiring a tenant "to waive or to forego any right or remedy provided by applicable law," because it effectively allows a landlord to bring a summary ejectment proceeding based on allegedly overdue "rent" that the tenant has already paid.

---

[1] The Tenants are Tenae Smith, Howard Smith, Simone Ryer, Dechonne McBride, and Louvinia Sneed.

Third, we hold that the "penalty" or "late fee" a landlord may charge a tenant for late payment of rent, which is capped at 5% of the monthly amount of rent due, Real Property § 8-208(d)(3)(i), is inclusive of any costs of collection other than court-awarded costs. Accordingly, § 8-208(d)(3)(i) precludes a landlord from charging a 5% late fee and also imposing additional charges incurred due to the late payment of rent, other than court costs when awarded by a court.

Fourth, we hold that the Circuit Court for Baltimore City erred in declining to review the merits of the Tenants' second renewed motion for class certification. A circuit court may, in the exercise of its discretion, deny a subsequent motion for class certification—or a motion to decertify a certified class—because, among other reasons, it does not represent a material change from a prior motion. Here, however, the new motion and the amended complaint on which it was based addressed all or nearly all of the grounds on which the court had rejected the prior motion. The court therefore erred in declining to review the merits of the motion on that basis.

Finally, we hold that the Appellate Court did not abuse its discretion in declining to rule on the Tenants' unpreserved contention that the circuit court erred by not granting their motion for summary judgment.

Accordingly, we will affirm the judgment of the intermediate appellate court.

3

## BACKGROUND

### A.     *Statutory Background*

We begin by exploring the two statutory provisions that are most relevant to the issues before us, §§ 8-401 and 8-208 of the Real Property Article.

### 1.     *Real Property § 8-401*

Section 8-401 provides a process by which a landlord can obtain an order for the summary ejectment of a tenant who has fallen behind on rent.  Summary ejectment "is a powerful tool" that allows a landlord to repossess a leased premises as well as "collect unpaid rent in an efficient and expedient manner." *Assanah-Carroll v. Law Offs. of Edward J. Maher, P.C.*, 480 Md. 394, 431 (2022).

In *Brown v. Housing Opportunities Commission of Montgomery County*, 350 Md. 570 (1998), this Court reviewed the development of the statutory right of summary ejectment.  As the Court explained, the common law action of (non-summary) ejectment originally developed as a mechanism to provide an ousted tenant with a cause of action to recover possession of leased property.  *Id.* at 578.  The action was eventually extended to permit landlords "to recover possession from their tenants."  *Id.*  Ejectment allowed a landlord with a lease that provided a right of reentry for non-payment of rent to bring an action to recover possession of the premises "whenever a half-year's rent was in arrears." *Id.* at 581 (discussing 1872 Md. Laws, ch. 346).

The General Assembly first approved *summary* ejectment in cases of a tenant's non-payment of rent through Chapter 529 of the 1937 Laws of Maryland, which provided

4

landlords with the right to repossess leased premises "whenever a tenant under any rental agreement failed to pay the rent provided for in the agreement."[2] *Id.* at 581. Under Chapter 529, a landlord—or an attorney or "duly qualified agent" on the landlord's behalf—could initiate a summary ejectment action by filing "a simple complaint describing the property in general terms and stating the name of the tenant and the amount of rent due." *Id.* Trial was to be held on the second day after the complaint was filed, and a prevailing landlord could recover possession of the premises as well as a "judgment for the amount of rent due and costs." 1937 Md. Laws, ch. 529. However, if a tenant tendered the amount of rent due and costs of the suit at trial or the adjournment of trial, the complaint was deemed "satisfied" and the proceedings complete. *Id.* If the landlord prevailed at trial, a justice of the peace was to order the tenant to yield possession of the leased premises within two days. *Id.* A tenant who did not do so could be removed by force if necessary. *Id.*

The current § 8-401 includes many of the elements of the summary ejectment process the General Assembly first adopted in 1937. A landlord may initiate a summary ejectment action "[w]henever the tenant or tenants fail to pay the rent when due and payable."[3] Real Prop. § 8-401(a). A landlord does so by filing a complaint in the District

---

[2] Summary ejectment has been available to landlords for another purpose—recovering possession from holdover tenants—since 1793. *Brown*, 350 Md. at 580 (discussing 1793 Md. Laws, ch. 43).

[3] In 2021, the General Assembly: (1) amended § 8-401 to require landlords to provide residential tenants with written notice of an intent to file a summary ejectment action if the outstanding rent is not paid within ten days; and (2) established a right to counsel for tenants in summary ejectment proceedings. 2021 Md. Laws, ch. 746. Because

5

Court of Maryland describing the property, naming the tenants, "[s]tating the amount of rent and any late fees due and unpaid,"[4] and requesting to repossess the premises. *Id.* § 8-401(b)(2). The complaint may also request "a judgment for the amount of rent due, costs, and any late fees." *Id.* § 8-401(b)(2)(iv). The landlord, who may be represented in the proceeding by a non-lawyer, Md. Code Ann., Bus. Occ. & Prof. Art. § 10-206(b)(1) (2018 Repl.; 2023 Supp.), also must "specify the amount of rent due for each rental period under the lease, the day that the rent is due for each rental period, and any late fees for overdue rent payments," Real Prop. § 8-401(b)(3).

Personal service of the complaint and summons is required if the landlord seeks, in addition to repossession of the property, a judgment for unpaid rent from a residential tenant. *Id.* § 8-401(b)(5), (e)(2)(iv). Otherwise, service may be made by first-class mail and by "affix[ing] an attested copy of the summons conspicuously upon the property." *Id.* § 8-401(b)(4), (5). In either case, the summons directs the tenant to appear for a "trial to be held on the fifth day after the filing of the complaint." *Id.* § 8-401(b)(4)(i). The court

---

both changes post-date the events relevant to the complaint in this action, we will not address them further.

[4] Section 8-401 requires the landlord to state the amount of unpaid rent and late fees "less the amount of any utility bills, fees, or security deposits paid by a tenant under § 7-309 of the Public Utilities Article" and requires that such amounts also be deducted from any award made. Real Prop. § 8-401(b)(2)(iii)-(iv). Section 7-309 of the Public Utilities Article applies to tenants who are subject to leases pursuant to which landlords are required to pay utilities. Under that provision, if a landlord fails to pay the utilities, under certain circumstances the tenants may arrange to pay the utility company directly and deduct any such payments from their rent. Because the provisions of § 7-309 are not relevant to the issues presented here, we will not address them further.

may adjourn trial for one additional day to enable either party to procure necessary witnesses, but not for a longer period without unanimous consent. *Id.* § 8-401(e)(1). Pretrial discovery is not permitted. Md. Rule 3-711.

At trial, the tenant must "show cause" as to why the landlord should not prevail. Real Prop. § 8-401(b)(4)(ii). If the court determines "that the rent, or any part of the rent and late fees are actually due and unpaid," the court must: (1) determine the amount of rent and late fees due at the time the complaint was filed;[5] (2) if the tenant was personally served, enter a judgment in the amount of overdue rent and late fees, along with court costs;[6] and (3) "order that possession of the premises be given to the landlord . . . within 4 days after the trial." *Id.* § 8-401(e)(2), (3). However, if at the trial or at the adjournment of the trial, the tenant tenders to the landlord the rent and late fees due, along with the costs of suit, the court must enter the complaint "as being satisfied." *Id.* § 8-401(e)(5). Any appeal from the court's judgment must be taken within four days. *Id.* § 8-401(h)(1).

If the tenant does not comply with the court's order awarding possession to the landlord within four days, the landlord may request, and the court must issue, a warrant of restitution directing a qualified county official to deliver possession of the property to the

---

[5] If trial does not occur within the timeframe permitted by the statute, the court must also include rent accruing after the complaint was filed. Real Prop. § 8-401(e)(2)(iii).

[6] Because this case concerns only residential leases, our discussion of the applicable law is limited to provisions related to residential leases unless otherwise specified. Section 8-401(e) treats non-residential tenancies differently from residential tenancies in several respects, including with respect to the type of service required to obtain a monetary judgment and the ability to recover attorney's fees.

landlord, including by removing the tenant's belongings from the property, "by force if necessary." *Id.* § 8-401(f)(1)(i).[7] However, "at any time before actual execution of the eviction order," the tenant maintains a statutory right to redeem the premises by tendering to the landlord "all past due amounts" plus court awarded costs and fees.[8] *Id.* § 8-401(g)(1); *Velicky v. Copycat Bldg. LLC*, 476 Md. 435, 454 (2021).

The summary ejectment process set forth in § 8-401 reflects the following legislative judgments: (1) the bargain between a landlord and a tenant is that the tenant is entitled to possession of the leased premises only for so long as the tenant is current on the obligation to pay rent; (2) once the tenant is not current on that obligation, the landlord has the right to regain possession unless the tenant becomes current on the obligation before the landlord actually takes possession; and (3) because determining who has the superior right to possession depends only on whether the tenant is current on the obligation to pay rent, it is susceptible to proof through an expedited process that is "substantively and procedurally limited, precluding complexity." *McDaniel v. Baranowski*, 419 Md. 560, 585 (2011); *see also id.* at 578 ("It is obvious that, in this truncated process, the landlord's

---

[7] The landlord has 60 days from the date of judgment to request the warrant, and 60 days from the date the warrant is issued to act on it, or the judgment of possession is stricken. Real Prop. § 8-401(f)(1)(ii)-(iii).

[8] The tenant loses the statutory right of redemption if three judgments of possession have been entered against the tenant in the prior twelve months, Real Prop. § 8-401(g)(3), or if four such judgments are entered in that timeframe in Baltimore City, Code of Public Local Laws of Baltimore City § 9-5(b)(2) (2023).

entitlement to enforcement of his superior interest in the premises is a given, once the failure to pay rent is proven and appropriate notice is provided.").

## 2. *Real Property § 8-208*

Section 8-208 of the Real Property Article requires a landlord who offers five or more dwellings for rent in Maryland to use a written lease, and establishes requirements for what such leases must and must not contain. As relevant here, § 8-208(d) provides:

> A landlord may not use a lease or form of lease containing any provision that:
>
> . . .
>
> (2) Has the tenant agree to waive or to forego any right or remedy provided by applicable law; [or]
>
> (3)(i) Provides for a penalty for the late payment of rent in excess of 5% of the amount of rent due for the rental period for which the payment was delinquent[.]

Any such provisions in a residential lease are unenforceable by the landlord. Real Prop. § 8-208(g)(1). A tenant may recover actual damages and reasonable attorney's fees incurred when a landlord includes a prohibited provision in a lease or attempts to enforce a prohibited provision. *Id.* § 8-208(g)(2). We discuss the history of this provision more fully in Section I.D below.

## B. *Factual Background*

The Tenants are five former tenants at four residential properties managed by Westminster in Baltimore City and Baltimore County. Each of the Tenants signed a standard form lease, which Westminster offers on a take-it-or-leave-it basis at its Maryland properties. Each lease contains the following provisions relevant to our analysis:

9

- A specified term during which the landlord leases the identified premises to the tenant for a specified "rental" amount, payable in advance in equal monthly installments without demand on the first day of each month;

- A "Definition of Rent" provision stating: "All payments from Tenant to Landlord required under the terms of this Lease, including, but not limited to, Court costs, shall be deemed rent";

- A provision imposing an administrative fee in the amount of 10% of "current monthly rental" and obligating tenants to pay attorney's fees, in the event they or specified other individuals violate the lease;

- A provision stating that if the landlord employs an agent to institute proceedings to collect rent or repossess the premises, the tenant must pay the reasonable costs incurred for the agent's services if the rent was due and payable when the proceedings were initiated;

- A "Late Charge" provision obligating the tenant to pay, "as additional rent," a charge of 5% of the monthly rental if the tenant fails to pay any installment of rent by 4:30 p.m. on the fourth day beyond the due date;

- An "Application of Payments" provision stating: "All payments from Tenant to Landlord may, at Landlord's option, be applied in the following order to debts owed by Tenant to Landlord: late charges, agent's fees, attorney's fees, court costs, obligations other than rent (if any) due Landlord, other past due rent other than monthly rent, past due monthly rent, current monthly rent"; and

- A provision for automatic renewal of the lease absent three months' advance written notice by tenant or landlord of an intent not to renew.

Whenever any of its tenants fail to pay monthly rent by the fifth day of the month, Westminster promptly: (1) charges a 5% late fee on or about the sixth day of the month; (2) submits information about the delinquent tenants to its agent, eWrit, which then files summary ejectment actions against those tenants; and (3) charges each tenant, sometimes before a complaint is filed, both a "summons fee" of at least $20 and an "agent fee" or "filing fee" of $10. The "summons fee" is reimbursement for the amount the District Court charges to file the complaint, which varies by jurisdiction. The "agent fee" or "filing fee"

10

is reimbursement for the amount Westminster pays eWrit to prepare and file summary ejectment complaints. Each of the Tenants was charged one or more of those fees on one or more occasions after being late with their rent.

Westminster charges a second set of fees if it proceeds further toward eviction. If the District Court enters judgment for Westminster in a summary ejectment action, and if the tenant has not paid in full by midmonth, Westminster, through eWrit, files for a warrant of restitution authorizing the sheriff to carry out an eviction. Upon taking that step, Westminster charges tenants a "writ fee" of up to $50, depending on the jurisdiction. Through January 2018, Westminster charged tenants at Baltimore City properties a "writ fee" of $80 even though the court fee at that time was only $50.[9] Westminster also charged tenants an additional $12 "agent" or "writ agent" fee when eWrit filed for a warrant of restitution, even though eWrit did not charge Westminster any additional fee for that service. After this litigation began, Westminster credited the $12 agent fees and the $30 overcharge for the Baltimore City writ fees to the accounts of then-current tenants who had been charged those fees, including two of the named plaintiffs. The credits did not include interest, nor were any reimbursements made to former tenants.

Westminster at times sent notices to tenants stating that they may be evicted if they did not pay "rent" in full, including agent and summons fees. Westminster typically sent

---

[9] In Baltimore City, there is a $10 filing fee and a $40 service fee for warrants of restitution. District Court of Maryland Cost Schedule, available at https://www.courts.state.md.us/sites/default/files/court-forms/dca109.pdf (last accessed Feb. 13, 2024), *archived at* https://perma.cc/92BJ-7AQB.

11

these notices to tenants around the second week of the month, after it charged agent and summons fees (and thus, presumably, after it filed a failure to pay rent complaint), but before it filed for a warrant of restitution.

### C. Procedural Background

#### 1. The Complaint

The Tenants filed their initial complaint in the Circuit Court for Baltimore City in 2017. *Smith v. Westminster Mgmt., LLC*, Case No. 24-C-17-004797. The operative complaint now is the third amended complaint, filed in May 2019. In Count One, the Tenants allege, on behalf of themselves and a putative class of current and former Westminster tenants, that Westminster has violated and continues to violate two of the statutory lease prohibitions in Real Property § 8-208.

First, the Tenants contend that Westminster violates the prohibition in Real Property § 8-208(d)(3)(i) against penalties for late payment of rent in excess of 5% of the amount of rent due for the rental period at issue. The Tenants claim that this is so because, upon the nonpayment of rent, Westminster charges them "agent fees," "summons fees," and "writ fees," in addition to a 5% late fee.

Second, the Tenants contend that Westminster violates the prohibition in Real Property § 8-208(d)(2) against requiring a tenant "to waive or to forego any right or remedy provided by applicable law" by (1) defining "rent" in the lease to include all amounts owed to the landlord and (2) providing that the landlord may allocate all payments from the tenant to non-"rent" charges before allocating such payments to "rent." The Tenants contend that

12

those provisions of the lease operate to waive their statutory right to face summary eviction under Real Property § 8-401 only for the failure to pay "rent."

In Counts Two and Three, respectively, the Tenants allege violations of the Maryland Consumer Debt Collection Act and the Maryland Consumer Protection Act. In Count Four, the Tenants allege that Westminster breached the leases by, among other things, utilizing an overly broad definition of rent and charging excessive late fees. In Count Five, the Tenants allege that Westminster breached the leases by charging agent fees it never incurred. Counts Two through Five are not directly at issue here, so we will not discuss them further.

In Count Six, the Tenants seek a declaration, individually and on behalf of the putative class, that (1) Westminster may not charge fees in excess of the 5% late fee limit for failure to pay rent; (2) Westminster may not charge an "agent fee" or other fees it has not incurred related to filing a warrant of restitution; (3) the 5% late fee may be based only on base monthly rent actually due and owing in the relevant period; and (4) Westminster's lease provision defining "rent" and the payment allocation provision are illegal and unenforceable. The Tenants further request that the circuit court either enjoin Westminster from collecting excessive fees or, in the alternative, issue a declaration that Westminster is not entitled to enforce collection of those fees.

### 2. *Class Certification*

The Tenants filed an initial motion for class certification in November 2018. In January 2019, before that motion was decided, the Tenants filed a second amended

13

complaint and, with it, a revised motion for class certification. The circuit court denied the revised motion for class certification in April 2019 on grounds that we discuss in detail below. The Tenants then filed a third amended complaint in May 2019, along with a second revised motion for class certification. In July 2019, the court, treating the second revised motion as a motion for reconsideration, declined to reconsider its ruling. The court concluded that there was no compelling reason for it to do so, that no "materially changed or clarified circumstances" supported reconsideration, and that the third amended complaint did "not materially change the circumstances of the case to convince the court to reconsider or alter" its prior order.

### 3.    *Summary Judgment*

The parties filed cross motions for summary judgment in October 2019. In January 2020, in a one-sentence order, the circuit court granted Westminster's motion as to all counts of the third amended complaint "for reasons outlined in [Westminster's motion] and those which [Westminster] made during argument in open Court," and denied the Tenants' motion for summary judgment.[10] Despite the request for entry of declaratory relief in Count Six, the court did not enter a declaration of the rights and obligations of the parties. *See Bowen v. City of Annapolis*, 402 Md. 587, 608 (2007) ("This Court, on numerous occasions, has reiterated that 'whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the

---

[10] Different judges ruled on the summary judgment motions and the class certification motions.

rights of the parties under the issues made.'" (quoting *Case v. Comptroller*, 219 Md. 282, 288 (1959))).

The Appellate Court reversed in a thorough and thoughtful opinion. *Smith v. Westminster Mgmt., LLC*, 257 Md. App. 336, 420 (2023). As relevant here, the Appellate Court held that "rent" for purposes of Real Property § 8-401, with respect to residential tenants, means "the periodic charge for use or occupancy of the premises, but not the various other payments that the tenant may owe to the landlord from time to time, even if the lease characterizes them as 'deemed rent' or 'additional rent.'" *Id.* at 372 (quoting *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 425 (2016)). The court also concluded that a residential landlord in a summary ejectment action may recover, in addition to the rent due, only late fees and court costs as awarded by the court, and that the Tenants had therefore asserted a viable claim that Westminster exceeds the statutory late fee cap when it charges agent and summons fees in addition to late fees upon late payment of rent. *Id.* at 373-75. The court also impliedly rejected Westminster's arguments that the allocation provision of its leases does not, as a matter of law, violate Real Property § 8-208(d). *Id.* at 391, 393, 394, 403.[11] The intermediate appellate court thus held that the circuit court erred in granting Westminster's motion for summary judgment. *Id.* at 420. The court declined to review the circuit court's denial of the Tenants' motion for summary

---

[11] In rulings not challenged by Westminster in this Court, the Appellate Court also revived the Tenants' claims under the Maryland Consumer Debt Collection Act and the Maryland Consumer Protection Act, and for breach of contract. *Smith*, 257 Md. App. at 392-402.

15

judgment, concluding that the Tenants had not raised or meaningfully argued that issue in their briefs. *Id.* at 380 n.38, 386 n.44.

Finally, with respect to class certification, the Appellate Court concluded that "[t]o the extent that the circuit court viewed the [Tenants'] second motion for class certification as simply a motion for reconsideration, the court erred." *Id.* at 418. Relying on this Court's recent decision in *Chavis v. Blibaum & Associates, P.A.*, 476 Md. 534 (2021), the court held that, given its conclusion "that appellants presented viable claims," the Tenants should be permitted to file a new motion for class certification on remand. *Smith*, 257 Md. App. at 419-20.

Westminster filed a petition for a writ of certiorari, and the Tenants filed a cross-petition. This Court granted both. *Westminster Mgmt., LLC v. Smith*, 483 Md. 571 (2023).

## DISCUSSION

## I. REAL PROPERTY §§ 8-208 AND 8-401 CONTENTIONS

### A. *Standard of Review*

This Court reviews a circuit court's grant of summary judgment without deference. *Bd. of County Comm'rs of St. Mary's County v. Aiken*, 483 Md. 590, 616 (2023). The Court undertakes "an independent review of the record to determine whether a genuine dispute of material fact exists and whether the moving party is entitled to judgment as a matter of law." *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 694 (2015).

16

### B. *"Rent" Defined*

Westminster and the Tenants propose different interpretations of the term "rent" as used in Real Property § 8-401 and applied to residential leases. Westminster, citing precedent from this Court interpreting § 8-401 in the commercial lease context (*Shum v. Gaudreau*, 317 Md. 49 (1989) and *University Plaza Shopping Center, Inc. v. Garcia*, 279 Md. 61 (1977)), contends that "rent" can mean whatever the parties agree it means in the lease, as long as the landlord is not shown to have engaged in overreaching or coercion. The Tenants, citing precedent from this Court interpreting a sister provision of the Real Property Article in the context of a residential lease (*Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397 (2016)), contend that the Appellate Court correctly defined "rent" for a residential lease more narrowly. We agree with the Tenants and the Appellate Court.

As this Court observed more than 30 years ago, "[t]he primary significance in classifying various monetary obligations as rent is to give the landlord the benefit of special landlord remedies in the event of default, such as summary dispossession of the tenant[.]" *Shum*, 317 Md. at 63 n.9 (quoting R. Schoshinski, *American Law of Landlord and Tenant* § 5:35 at 338 (1980)). In effect, the broader the scope of what constitutes "rent," the broader the scope of unpaid obligations that can serve as a basis on which a landlord may initiate a summary ejectment action under Real Property § 8-401.

We pause at the outset to emphasize that what hangs in the balance of our decision concerning the scope of "rent" for purposes of § 8-401 is not whether a landlord can enforce any particular payment obligation owed by a tenant. Instead, the issue is whether a landlord

17

can enforce any such obligation *through the mechanism of a summary ejectment action.*[12] Given the efficiencies involved in the expedited summary ejectment process, as well as the substantial leverage it provides to landlords, it is understandable that landlords would prefer to use summary ejectment to enforce as many tenant obligations as possible. But the General Assembly has made it available only to enforce the obligation to pay "rent." Our task is, therefore, to determine the scope of tenant payment obligations encompassed by the General Assembly's use of that term, and whether it was the General Assembly's intent to permit landlords and tenants to expand that scope by defining other obligations as "rent."

### 1. *Prior Caselaw*

We are not writing on an entirely blank slate. On three prior occasions, this Court has wrestled with the meaning of "rent" under a provision of Title 8 of the Real Property Article. Although none of those cases concerned a summary ejectment proceeding involving a residential lease, their analyses are instructive.

First, in *Garcia*, 279 Md. 61, we considered the meaning of "rent" in Real Property § 8-401 in the context of a commercial lease. A lease for a grocery store required the tenant to pay as "additional rent," among other things, "all other sums of money or charges

---

[12] In addition to a common law action for breach of contract, the Real Property Article provides landlords with causes of action that can be used in different circumstances, including an action for distress for rent, Real Prop. §§ 8-302–8-332; a tenant hold over action, *id.* § 8-402; and an action for breach of lease, *id.* § 8-402.1. *See generally Ben-Davies v. Blibaum & Assocs., P.A.*, 457 Md. 228, 252-58 (2018); *see also Velicky*, 476 Md. at 453-60 (summarizing landlord statutory remedies for repossession of property).

18

required to be paid by Tenant under this lease." *Id.* at 63. When the tenant failed to pay certain construction costs, the landlord brought a summary ejectment action. *Id.* at 64. One of the tenant's defenses was that the construction costs were not "rent." *Id.* In rejecting that argument, the Court found "substantial agreement" among courts "that 'rent', in its legal connotations, is the compensation paid by a tenant for the use of land," *id.* at 65-66, and held that "charges which may be definitely ascertained, paid by the tenant, and going to [the tenant's] use, possession and enjoyment of rental commercial premises, are rent if such was the intention of the parties," *id.* at 67. Applying that standard, the Court held that the construction charges at issue were "rent" under the lease and that the tenant's failure to pay them was ground for a summary ejectment action.[13] *Id.* at 68.

Notably for our purposes, in arriving at its holding, the Court emphasized that its decision was limited "to premises leased for commercial purposes as distinguished from residential use." *Id.* at 67. The Court observed that the terms of commercial leases defining "rent" broadly could be expected to "fairly represent the actual intention of the parties" because in such leases "there is little likelihood of successful overreaching on the part of the landlord and of coerced adhesion on the part of the tenant." *Id.* The same could not be

---

[13] Before concluding that the construction charges at issue qualified as "rent," the Court observed that the fact that "the charges went to Tenant's use, possession and enjoyment of the demised premises is so clear as not to require discussion." *Garcia*, 279 Md. at 68. It thus appears that our predecessors did not embrace the full breadth of the definition of "rent" in the lease, but were willing to apply it to charges going to the tenant's use, possession, and enjoyment of the premises. While costs for construction intended to make the property useful to the tenant plainly meet that standard, it is less clear that costs incurred to sue the tenant for rent owed—such as those at issue here—would.

said in the residential context. *Id.* In dicta, the Court stated that whether certain charges are included in "rent" in a residential lease was "best left for determination on a case to case basis, depending upon the provisions of the lease, express or implied, verbal or written, and, where appropriate, the attendant circumstances." *Id.*

Second, in *Shum*, 317 Md. 49, we applied our ruling in *Garcia* in the context of another commercial lease.[14] At issue in *Shum* was the landlord's attempt to recover from the tenant damages due to property damage and for costs incurred to adapt the premises to the tenant's permitted use. *Id.* at 53, 61. As part of its analysis, the Court explored whether such contract damages could have been recoverable as "rent" in an earlier summary ejectment action.[15] *Id.* at 61-63. The Court ultimately concluded that those damages were recoverable as "rent" to the extent they were incurred before the tenant vacated the property. *Id.* at 65-67.

Notably, our discussion in *Shum* emphasized that the holding in *Garcia* was limited to commercial leases and "expressly le[ft] open, for determination on a case-by-case basis,

---

[14] Although the property at issue in *Shum* was a residential property, it was undisputed that it was used for commercial purposes. 317 Md. at 63-64. The Court therefore treated the lease as commercial. *Id.*

[15] The issue addressed in *Shum* was whether the breach of contract action was precluded in whole or in part by res judicata due to the prior summary ejectment proceeding. 317 Md. at 53. The landlord had neither sought nor recovered the contract damages at issue in the summary ejectment proceeding. *Id.* at 52. The issue for res judicata purposes, however, was whether the landlord could have made a claim for such damages in the earlier proceeding. *Id.* at 59. In that context, the Court explored what contract damages could have been recovered as "rent" in the summary ejectment proceeding. *Id.* at 61-66.

'the question whether similar charges under a lease of residential property would be rent.'" *Shum*, 317 Md. at 62-63 (quoting *Garcia*, 279 Md. at 67). We further observed that in addition to the concern expressed in *Garcia* about the uneven bargaining power between landlords and residential tenants, "there may be other policies that would not allow free rein in the definition of rent to the parties to a residential lease." *Id.* at 63 n.9.

Third, in *Lockett*, 446 Md. 397, we considered the meaning of rent as used in Real Property § 8-208.1, which prohibits a landlord from taking certain retaliatory actions against a residential tenant. The issue in *Lockett* was whether the tenant was eligible for relief under § 8-208.1 for one of two instances of retaliation found by the circuit court. *Id.* at 415. That issue, in turn, depended on whether the tenant was "current on the rent" at the time the landlord engaged in the retaliatory conduct. *Id.* Although the parties agreed that the tenant "had fully paid the fixed monthly amount specified as the 'rent'" in her lease, they disputed whether she had paid "other charges, such as utility charges and other fees that varied from month-to-month and that the lease 'deemed rent.'" *Id.* at 404. Notwithstanding their treatment in the lease, we determined that such charges were not "rent" for purposes of § 8-208.1. *Id.* at 425. Our analysis is instructive.

As an initial matter, we rejected the landlord's argument that *Garcia* and *Shum* controlled the outcome. *Id.* at 419-20. Observing that the holdings in those cases were expressly limited to commercial leases, which are likely to be the product of negotiations between the parties, we stated that "[r]esidential leases are more likely to be provided on a take-it-or-leave-it basis and, as here, to be provided after the tenant has already agreed to

21

lease the premises and to be signed by the tenant without being read." *Id.* at 419-20. Moreover, we observed, "deferring to the lease's definition of 'rent' would incentivize landlords to characterize all possible debts from the tenant to the landlord as 'rent[.]'" *Id.* at 420.

After noting that the lease at issue in *Lockett* was itself internally inconsistent in how it referred to "rent," we turned to our "normal tools of statutory construction for guidance." *Id.* at 420-21. Beginning with the plain text, we observed that dictionary definitions of rent generally defined it as "the periodic sum paid for the use or occupancy of property." *Id.* at 421. We further observed that the statutory context also supported an interpretation of rent as "the periodic amount paid by a tenant for use or occupancy." *Id.* at 422. That context included other uses of "rent" in § 8-208.1, as well as references to the term elsewhere in subtitle 2 of Title 8, all of which suggested a readily ascertainable fixed sum payable on a periodic basis. *Id.* at 422-23.

Turning to legislative purpose, we recognized that § 8-208.1 was a remedial statute that is to "be liberally construed . . . in order to effectuate [its] broad remedial purpose," *id.* at 424 (quoting *Pak v. Hoang*, 378 Md. 315, 326 (2003)), and for which exemptions "must be narrowly construed," *id.* at 424 (quoting *State Admin. Bd. of Election Laws v. Billhimer*, 314 Md. 46, 64 (1988)). We therefore concluded that "the gas charges, late fees, and court filing fee" in dispute were not "rent" for purposes of § 8-208.1 and so were irrelevant to the determination of whether the tenant was "current on the rent." *Id.* at 425.

22

Westminster contends that *Garcia* and *Shum* are dispositive here, standing for the proposition that "additional rent charges" are rent if the parties have so agreed unless, on a case-by-case basis, the landlord is shown to have engaged in overreaching or coercion. We disagree. The holdings of both cases were expressly limited to the commercial context, and both identified the difference in bargaining power in the residential context as a reason why a different rule may apply there. *Shum*, 317 Md. at 62-63, 63 n.9; *Garcia*, 279 Md. at 67. That same concern is further reflected in our related discussion in *Lockett*. 446 Md. at 419-20.

Although *Garcia* and *Shum* each include dicta suggesting that the enforceability of broad definitions of "rent" in residential leases might be determined on a case-by-case basis, *Garcia*, 279 Md. at 67; *Shum*, 317 Md. at 62-63, doing so in the summary ejectment context is not feasible. As discussed in *Shum*, the General Assembly "limited a summary ejectment action to repossession of premises and rent actually due," because the determination of rent due is generally "a relatively straightforward calculation, and its recovery is not inconsistent with simple and speedy adjudication." 317 Md. at 60. However, introducing issues involving "possible complexities of proof" "would be contrary to the purpose of the summary ejectment statutory scheme." *Id.* As Westminster admitted during oral argument, an investigation into the facts and circumstances surrounding the negotiation of a lease to determine whether the landlord had overreached or exercised coercion is incompatible with the discovery-free, high-volume, expedited

23

summary ejectment process.[16]  In effect, Westminster's position is that when it brings a summary ejectment action against a tenant, the tenant is bound by whatever definition of "rent" is in the lease unless the tenant succeeds in proving a claim that cannot be proven in a summary ejectment proceeding.  We find that contention untenable.

In sum, *Garcia* and *Shum* are not dispositive.  *Lockett*, which was limited to determining the definition of "rent" in § 8-208.1, is persuasive but also not dispositive.  We therefore turn to our normal tools of statutory construction.

### 2. *Statutory Interpretation Principles*

"The goal of statutory construction is to discern and carry out the intent of the Legislature." *Blue v. Prince George's County*, 434 Md. 681, 689 (2013).  Our search for legislative intent begins with the text of the provision we are interpreting, viewed not in isolation but "within the context of the statutory scheme to which it belongs." *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 169 (2021).  Our review of the text is wholistic, seeking to give effect to all of what the General Assembly included and not to add anything that

---

[16] As Maryland Legal Aid and others note in their amicus brief, 211,509 summary ejectment cases were filed in the first six months of 2023, an average of 35,251 per month. District Court of Maryland, *2023 Statistics*, at 9, 18, 27, 36, 45, 54 available at https://mdcourts.gov/sites/default/files/import/district/Calendar_2023.pdf (last accessed Feb. 6, 2024), *archived at* https://perma.cc/8P93-KSVQ.  A 2016 report on Rent Court proceedings in the District Court in Baltimore City found that there were three Rent Court dockets daily with room for up to 1,100 cases per day. *District Court of Maryland for Baltimore City*, Rent Court Summer Work Group Report, at 3 (Dec. 8, 2016), available at https://www.ubalt.edu/academics/prelaw/Rent%20Court%20Summer%20Work%20Group%20Report%20FINAL.pdf (last accessed Feb. 6, 2024), *archived at* https://perma.cc/M2NN-TW3H.

the General Assembly omitted. In our analysis of statutory text, we therefore take the language as we find it, neither adding to nor deleting from it; we avoid "forced or subtle interpretations"; and we avoid constructions that would negate portions of the language or render them meaningless. *Wheeling v. Selene Fin. LP*, 473 Md. 356, 377 (2021); *see also Lockshin v. Semsker*, 412 Md. 257, 275 (2010); *Koste v. Town of Oxford*, 431 Md. 14, 25-26 (2013). When statutory terms are undefined, we often look to dictionary definitions as a starting point, to identify the "ordinary and popular meaning" of the terms, *Comptroller v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 390 (2022), before broadening our analysis to consider the other language of the provisions in which the terms appear and the statutory scheme as a whole, including any legislative purpose that is discernible from the statutory text. *Lockshin*, 412 Md. at 275-76. Presuming the General Assembly "intends its enactments to operate together as a consistent and harmonious body of law," we also "seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Wheeling*, 473 Md. at 377 (quoting *Lockshin*, 412 Md. at 275-76).

After exhausting the tools available for our textual analysis, viewed in context of the statutory scheme and in light of apparent legislative purpose, we determine whether the statute is ambiguous. Ambiguity can arise in two different ways: "Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme." *Bennett v. Harford County*, 485 Md. 461, 485-86

25

(2023) (quoting *FC-GEN Operations*, 482 Md. at 380). If neither applies, "our inquiry generally ceases at that point and we apply the statute as written."[17] *Williams v. Morgan State Univ.*, 484 Md. 534, 546 (2023) (quoting *Thornton Mellon, LLC v. Adrianne Dennis Exempt Tr.*, 478 Md. 280, 313-14 (2022)). If, however, the statute is ambiguous, we seek to "resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Bennett*, 485 Md. at 486 (quoting *FC-GEN Operations*, 482 Md. at 380). Such sources include "the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it." *Boffen v. State*, 372 Md. 724, 737 (2003) (quoting *Goldberg v. Miller*, 371 Md. 591, 602 (2002)); *see also Bledsoe v. Bledsoe*, 294 Md. 183, 189 (1982) ("the history of the passage of the law, the reports of committees and commissions, the introduction of amendments and testimony given before legislative committees" aid in examining legislative intent).

Finally, "[i]n every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *FC-GEN Operations*, 482 Md. at 380 (quoting *Wheeling*, 473 Md. at 377). When one interpretation of statutory

---

[17] Even when we determine that a statute's plain language is unambiguous, we may, in our discretion, decide to consult legislative history to confirm our interpretation of the statute's plain language. *Doe v. Catholic Relief Servs.*, 484 Md. 640, 652 (2023) (citing *Rowe v. Md. Comm'n on Civ. Rts.*, 483 Md. 329, 343 (2023) and *Wheeling*, 473 Md. at 384-85 n.9).

26

language would produce such a result, we will reject that interpretation in favor of another that does not suffer the same flaw. *Bell v. Chance*, 460 Md. 28, 53 (2018); *see also Nationstar*, 476 Md. at 170 (explaining that "it is important to consider the consequences of alternative interpretations of the statute, in order to avoid constructions that are illogical or nonsensical, or that render a statute meaningless" (internal quotations and citations omitted)).

### 3. Statutory Construction of "Rent"

The term "rent" is not defined in Title 8 of the Real Property Article. *Lockett*, 446 Md. at 418. Turning to dictionary definitions to begin our textual analysis, *Merriam-Webster* defines "rent" as "a usu[al] fixed periodical return made by a tenant or occupant of property to the owner for the possession and use thereof; esp[ecially]: an agreed sum paid at fixed intervals by a tenant to the landlord." *Rent*, *Merriam-Webster's Collegiate Dictionary* 1054 (11th ed. 2014). The *New Oxford American Dictionary* defines "rent" as "a tenant's regular payment to a landlord for the use of property or land." *Rent*, *New Oxford American Dictionary* 1478 (3d ed. 2010). And *Black's Law Dictionary* similarly defines "rent" as "[c]onsideration paid, usu[ally] periodically, for the use or occupancy of property (esp[ecially] real property)." *Rent*, *Black's Law Dictionary* 1551 (11th ed. 2019). We thus begin with an understanding that the usual and ordinary meaning of "rent" is a tenant's fixed, periodic payments to a landlord for the use or possession of property.

As in *Lockett*, the statutory context further supports that interpretation. Section 8-401 refers to "rent" several times in circumstances suggesting its ordinary meaning. For

27

example, § 8-401(b)(3) requires a landlord, for purposes of assisting the court's ultimate determination of "the amount of rent and late fees due," Real Prop. § 8-401(e)(2)(ii), to specify "the amount of rent due for each rental period under the lease" and, separately, "any late fees for overdue rent payments." If "rent" encompassed those late fees, it would not be necessary to separately identify them. And if "rent" encompassed other amounts beyond "the amount of rent due for each rental period," landlords would presumably be required to specify those other charges as well. The same provision also requires a landlord to specify "the day that *the rent* is due for each rental period." *Id.* § 8-401(b)(3) (emphasis added). And several provisions of § 8-401 identify "rent" separately from "late fees" and "costs of suit."[18] *See, e.g.*, *id.* § 8-401(b)(2)(iii) & (iv), (e)(2)(iv), (e)(5), (g)(1).

In *Lockett*, we noted other provisions in subtitle 2 of Title 8 of the Real Property Article that supported our conclusion there that the General Assembly used "rent" "in a way that appears to exclude . . . variable charges." *Lockett*, 446 Md. at 423; *see* Real Prop. § 8-203(b) (limiting security deposits to two months' rent); *id.* § 8-203(i)(3)(i) (limiting the amount of a surety bond to two months' rent); *id.* § 8-212.3 (allowing utility payments

---

[18] Other provisions in subtitle 4 similarly delineate these terms separately. *See* Real Prop. § 8-402(a)(2), (a)(3)(ii) (in tenant holdover statute, damages for landlord must exceed "apportioned rent for the period of holdover at the rate under the lease" and court may give judgment for "damages determined to be due together with costs of the suit"); § 8-402.1(b)(2) (in breach of lease proceeding, tenant may retain possession through appeal if tenant, among other requirements, "pays all rent in arrears" *and* "all court costs"); § 8-402.1(c)(2) (in breach of lease proceeding, providing that tenant payments accepted by landlord after notice of breach of lease but before eviction "shall be first applied to the rent" and "then to court costs, including court awarded damages and legal fees").

28

to be deducted from rent under certain circumstances). And in the Appellate Court's decision in this case, in a ruling Westminster did not challenge, the intermediate appellate court held that "rent" as used in Real Property § 8-208 means the periodic charge for use or occupancy of the premises. *Smith v. Westminster Mgmt., LLC*, 257 Md. App. 336, 372 (2023). The context of the broader statutory scheme thus provides strong support for interpreting "rent" consistent with its ordinary meaning as a tenant's fixed, periodic payments to a landlord for the use or possession of property.

The apparent purpose of the summary ejectment statute is to allow landlords to repossess a rented premises upon nonpayment of rent quickly and efficiently, subject to the right of tenants to become current on their rent obligation (plus late fees and any awarded court costs) at any time before eviction.[19] As discussed above, summary ejectment is rooted in the superior right of a landlord to possession of a rented premises once the tenant has ceased paying rent. *See McDaniel v. Baranowski*, 419 Md. 560, 586 (2011) ("The summary ejectment procedure itself is mired in the superior title of the landlord to the leased premises, once nonpayment occurs[.]"). Nothing in the statute supports

_____

[19] At oral argument, counsel for Westminster, in discussing *Lockett*, stated that Real Property § 8-401 is a remedial statute intended to benefit landlords, and that it must therefore be construed liberally for the benefit of landlords. For two reasons, we disagree. First, the benefits provided to landlords are limited to circumstances in which "the tenant or tenants fail to pay the rent when due and payable." Real Prop. § 8-401(a). The definition of "rent" is thus critical to determining when the statute is implicated at all. Because the remedial purpose of the statute is limited to addressing matters properly within the scope of the statute, it would be inappropriate to invoke that remedial purpose as part of an inquiry into the scope itself. Second, the protections for tenants built into § 8-401 paint a more complicated picture of the purpose of the statute as a whole.

29

Westminster's position that the General Assembly intended to make summary ejectment available to landlords as a mechanism to collect any and all fees, costs, and other obligations residential tenants may owe in addition to "rent." We decline to expand the scope of a mechanism the General Assembly made available for a limited purpose.

We therefore conclude that when applied to residential leases, "rent," for purposes of Real Property § 8-401, means the fixed, periodic payments a tenant owes for use or occupancy of a rented premises.[20]

Westminster's other arguments in opposition to this interpretation lack merit. First, Westminster contends that reliance on *Lockett* is inconsistent with this Court's holding in *Ben-Davies v. Blibaum & Associates, P.A.*, 457 Md. 228, 270 (2018). We see no conflict. In *Ben-Davies*, the parties disputed the meaning of the phrase "money judgment for rent of residential premises," as used in § 11-107(b) of the Courts & Judicial Proceedings Article. *Id.* at 231. The appellee asserted that the analysis in *Lockett* showed that the definition of

---

[20] Even were we to look exclusively to the leases for the definition of "rent," the Westminster form lease is internally inconsistent, just as the lease was in *Lockett*. For example, although the "Definition of Rent" provision defines all payments due from the tenant to the landlord as "rent," the "Application of Payments" provision permits Westminster to allocate tenant payments to "late charges," "agent's fees," "attorney's fees," "court costs," and "obligations other than rent (if any) due Landlord," before allocating such payments to "monthly rent." The lease further requires a "late charge" of 5% of the "monthly rental" be paid as "additional rent" when the tenant fails to pay "an installment of the rent" on time. Furthermore, a paragraph addressing early termination of the lease requires a payment of "two [] additional mont[hs'] rent" and a paragraph regarding military tenants who receive change of station orders limits the liability of such tenants "for rent" in part to "[t]hirty days' rent." Many of these provisions make sense only if "rent" is limited to the fixed sum payable on a periodic basis for use and occupancy of the premises.

"rent" applied only "to money judgments entered in summary ejectment actions pursuant to [Real Property] § 8-401." *Ben-Davies*, 457 Md. at 270. We disagreed and held that *Lockett* did not control the analysis of the separate statutory scheme in the Courts & Judicial Proceedings Article. *Ben-Davies*, 457 Md. at 270-71. Nothing about our decision in *Ben-Davies* precludes the result we reach today or our reliance on the persuasiveness of the statutory interpretation analysis in *Lockett*.

Second, Westminster contends that we should not follow *Lockett* because "rent" would then have two different meanings under § 8-401, one applicable to residential leases and the other to commercial leases. But Westminster's preferred definition also leads to inconsistencies, as a residential tenant who was up-to-date on base monthly rent but not on other charged fees would have "fail[ed] to pay the rent" under § 8-401(a) and yet be "current on the rent" under § 8-208.1(d). The interpretation we adopt provides consistency in the treatment of residential leases.

Third, Westminster argues that if a landlord cannot recover all of a tenant's payment obligations through summary ejectment, the landlord will have to bring both a summary ejectment action and a separate action against the tenant for breach of contract to recover non-"rent" obligations. The implication of Westminster's argument is that, for a tenant, facing one lawsuit is better than facing two. But that is a policy decision for the General Assembly to make. As it stands, the General Assembly has limited recovery in a summary

31

ejectment action involving a residential lease only to "rent," late fees, and court costs.[21] Real Prop. § 8-401(e)(2)(iv). Westminster may not expand the scope of this special statutory remedy through the terms of leases it imposes on tenants.

Fourth, Westminster contends that the General Assembly indicated its support for Westminster's preferred definition of "rent" when the General Assembly considered, but failed to pass, several bills that would have enshrined the interpretation of "rent" that we adopt. *See* H.B. 1346, 2017 General Assembly Regular Session; S.B. 941/H.B. 473, 2019 General Assembly Regular Session. But, as the Tenants point out, the General Assembly also considered but failed to pass bills to codify Westminster's interpretation of "rent." *See* S.B. 493/H.B. 472, 2018 General Assembly Regular Session; S.B. 366/H.B. 558, 2019 General Assembly Regular Session. And even if we could discern a legislative preference from that mixed record, "legislative rejection is not an infallible indicator of legislative intent." *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 329 (2006) (quotation omitted). The General Assembly could have rejected those competing bills for any or multiple reasons, making its failure to pass them "a rather weak reed upon which to

---

[21] The General Assembly also specifically permitted landlords of commercial tenants (but *not* landlords of residential tenants) to recover reasonable attorney's fees in summary ejectment, if authorized in the lease, after the Appellate Court held that attorney's fees were not "rent." *See* Real Prop. § 8-401(e)(2)(v)(3); 2007 Md. Laws, ch. 236; H.B. 377, Fiscal Note (2007); *Law Offs. of Taiwo Agbaje, P.C. v. JLH Props., II, LLC*, 169 Md. App. 355, 370 (2006) ("Although Lessor may be entitled to recover reasonable attorney's fees incurred in connection with the Lessee's alleged breach of its contractual obligation to pay rent, if any, in a breach of contract proceeding, such fees are not 'rent' and, therefore, are not recoverable in a [Real Property] § 8-401 summary ejectment proceeding.").

lean in ascertaining legislative intent." *Id.* (quoting *Automobile Trade Ass'n v. Ins. Comm'r*, 292 Md. 15, 24 (1981)).

In sum, Westminster's additional arguments do not cause us to deviate from our interpretation of the statutory text. We therefore hold that "rent" as used in Real Property § 8-401 regarding a residential lease means the fixed, periodic payments that a tenant makes for the use or occupancy of the premises.[22]

### C.     *The Allocation Clause*

Each Westminster lease contains the following "Application of Payments" provision:

> All payments from Tenant to Landlord may, at Landlord's option, be applied in the following order to debts owed by Tenant to Landlord:  late charges, agent's fees, attorney's fees, court costs, obligations other than rent (if any) due Landlord, other past due rent other than monthly rent, past due monthly rent, current monthly rent.

The Tenants contend that this allocation clause violates Real Property § 8-208(d)(2)'s prohibition on lease provisions requiring tenants to waive or forego rights under law. According to the Tenants, the clause allows Westminster to allocate payments intended for "rent" to other obligations, forcing the Tenants to waive their right to be

---

[22] In its brief and at oral argument, Westminster identified confusion among litigants and courts concerning whether obligations delineated separately from a monthly installment of an annual rent obligation might fall within this definition. We do not purport to pre-judge any future dispute concerning any specific obligation. However, for guidance, our analysis does not preclude a charge other than a monthly installment of an annual rental amount from falling within the definition of "rent" if the charge is fixed, periodic, and mandatory for all tenants occupying similar units. Our analysis does preclude such charges if they are variable, assessed based only on a breach of the lease, or optional.

33

subject to summary ejectment only for a failure to pay "rent."  Westminster counters that the provision is a permissible contractual agreement that relieves tenants of the responsibility of "properly allocat[ing] their payment each month," and that it "affords complete predictability" about payments, allowing tenants to "forecast exactly how their payments will be allocated."  We agree with the Tenants.

As explained above, the summary ejectment statute permits a landlord to initiate expedited proceedings to evict a tenant when, and only when, the tenant fails to "pay the rent when due and payable."  Real Prop. § 8-401(a).  The General Assembly's statutory scheme does not subject tenants to summary ejectment proceedings for failure to pay non-"rent" obligations.  Yet the allocation clause purports to allow Westminster to do just that:  Westminster can apply a tenant's payment of "rent" to other obligations, claim that "rent" remains unpaid, and file a summary ejectment action on that basis.  Thus, Westminster's residential tenants may pay their "rent" but, failing to pay other obligations, still find themselves facing summary ejectment.  The allocation clause therefore results in a waiver of a tenant's right to be subject to summary ejectment only for failure to pay "rent," in violation of Real Property § 8-208(d)(2).

Our reasoning is consistent with that of the United States District Court for the District of Maryland in *Sager v. Housing Commission of Anne Arundel County*, 957 F. Supp. 2d 627 (D. Md. 2013).  The court in *Sager* correctly determined that under Maryland law, "a tenant has the right *not* to be summarily evicted except for failure to pay rent."  *Id.* at 636.  On the other hand, "if a tenant fails to pay other properly imposed

34

charges, such as maintenance fees, [the tenant] may be subject to eviction under state law, but only after a more fulsome proceeding and a finding that the failure to pay the fees is a 'substantial' breach of [the tenant's] lease that warrants an eviction." *Id.* at 633 (citing Real Prop. § 8-402.1). As a result, the court concluded that an allocation clause like the one in the Westminster leases violates Real Property § 8-208(d) because it waives the tenant's right to be subjected to the expedited and procedurally limited summary ejectment process only for failure to pay "rent."[23] *Id.* at 636-37.

Westminster's contention that the allocation clause provides predictability in how a tenant's payments will be allocated is both irrelevant and incorrect. It is irrelevant because predictability in allocation is not an exception to the prohibition in Real Property § 8-208(d)(2) against lease provisions requiring tenants to waive or forego legal rights or remedies. Westminster's contention is incorrect because its clause does not mandate any particular method of allocating payments. Instead, it permits Westminster to allocate payments in the order stated "at [Westminster's] option." The record suggests that Westminster does not always exercise that option, if it exercises it at all. According to the testimony of a Westminster corporate representative, Westminster allocates payments in three different ways: (1) it allows tenants who pay their bills online to choose how to

---

[23] Westminster argues that *Sager* is inapplicable to this case because it concerned a public housing tenant and relied on federal law. However, although there are differences between the circumstances present in *Sager* and those here, we nonetheless agree with the persuasive analysis of the court in *Sager*: allocation clauses may not be used to allocate payments of "rent" to non-"rent" obligations and thereby provide the basis for the initiation of a summary ejectment proceeding. *See id.* at 634-37.

allocate their payments; (2) it posts other payments by tenants at all but two of its properties "to the oldest balance possible";  and (3) at those two other properties, it allocates payments that tenants identify as rent to rent.[24]  The tenant ledgers in the record reflect payments applied to balances chronologically, not by category.

Westminster's other arguments are equally unpersuasive.  It argues that its allocation clause should be permissible because otherwise, it will need to maintain two distinct ledgers—one for "rent" and one for non-"rent" obligations.  As an initial matter, Westminster does not explain, and it is not readily apparent, why it would be more onerous to allocate payments first to "rent" and then to non-"rent" obligations, as opposed to first to non-"rent" obligations and then to "rent," as the allocation clause permits.  Moreover, the corporate representative's testimony described above suggests that Westminster already applies payments identified for "rent" to "rent" at two of its Maryland properties, and that it allows tenants at other properties who pay their bills online to allocate those payments as they wish.  In any event, the administrative burden of complying with the law is also not an exception to Real Property § 8-208(d)(2).

Finally, Westminster claims that the Tenants lack standing to argue that the allocation clause waived their rights in violation of Real Property § 8-208(d)(2) because all of them were delinquent in their rent regardless of the operation of the allocation clause,

---

[24] According to the Westminster representative, the different treatment of tenants at the two specific properties is because "[w]e have a very strong judge there that will say no, no, no, if you write rent you have to put it towards rent, so we try to make sure we don't have any issues at those two properties, we do apply it to their rent."

36

and so would have faced summary ejectment anyway. But the Tenants are not challenging the basis for their evictions in Count One of the third amended complaint; their claim is that Westminster violated § 8-208(d)(2) by including an impermissible provision in their leases. Whether the Tenants are able to prove damages resulting from the presence of the allocation clause in their leases is not before us.

## D. *"Hard Costs" in Summary Ejectment*

The third issue presented in this appeal is the Tenants' contention that Westminster violated Real Property § 8-208(d)(3)(i), which prohibits including in a residential lease any provision that "[p]rovides for a penalty for the late payment of rent in excess of 5% of the amount of rent due for the rental period for which the payment was delinquent." The Tenants contend that Westminster violates § 8-208(d)(3)(i) by automatically charging tenants who are more than five days delinquent a 5% late fee *plus*: (1) "agent fees" for the initiation of summary ejectment proceedings; and (2) "summons fees" before they are awarded by the court.[25] Westminster responds that § 8-208(d)(3)(i) does not limit its ability to contract to recoup "hard costs" that it actually incurs in pursuing summary ejectment,

---

[25] The Tenants do not contend that § 8-208(d)(3)(i) precludes Westminster from recovering "summons fees" and similar expenses if a court ultimately awards them as court costs. Indeed, § 8-401 expressly contemplates an award of court costs to a landlord in a summary ejectment proceeding, and mandates that a tenant pay such costs to exercise the right of redemption. Real Prop. § 8-401(e)(2)(iv), (g)(1). The Tenants' position, however, is that when a landlord automatically charges such fees to a tenant upon the tenant's failure to pay rent when due, along with the 5% late fee authorized in the lease and permitted by statute, the additional fees function as impermissible late fees exceeding the statutory 5% limit, not as permissible court costs.

37

including "agent fees" and "summons fees." According to Westminster, § 8-208(d)(3)(i) limits only the amount it can charge as a punitive "penalty" in addition to such "hard costs."

We turn once again to our ordinary tools of statutory construction. At the outset, we observe that although § 8-208(d)(3)(i) speaks in terms of a "penalty" for late payment, § 8-401 consistently refers to the same amount as "late fees." *See* Real Prop. § 8-401(b)(2)(iii) & (iv), (b)(3), (e)(2)(ii), (iii) & (iv), (e)(5) (all referring to "late fees").[26] We will therefore look to the ordinary meaning of both "penalty" and "late fees."

Some dictionaries define "penalty" as the equivalent of punishment. *See Penalty*, *New Oxford American Dictionary* 1295 (3d ed. 2010) (defining "penalty" as "[p]unishment imposed for breaking a law, rule, or contract; a disadvantage or unpleasant experience suffered as the result of an action or circumstance"); *Penalty*, *Black's Law Dictionary* 1368 (11th ed. 2019) (defining "penalty" as "[p]unishment imposed on a wrongdoer, usu[ally] in the form of imprisonment or fine; esp[ecially], a sum of money exacted as punishment for either a wrong to the state or a civil wrong (as distinguished from compensation for the injured party's loss)"). Another dictionary defines the term more specifically as a forfeiture upon wrongdoing. *See Penalty*, *Merriam-Webster's Collegiate Dictionary* 915 (11th ed. 2014) (defining "penalty" as the "suffering or the sum to be forfeited to which a person agrees to be subjected in case of nonfulfillment of stipulations"). Still others include

_____

[26] Although there is no express statutory link between the "penalty" provision of § 8-208(d)(3)(i) and the references to "late fees" throughout § 8-401, context suggests they are the same, the parties treat them as the same, and the legislative history discussed below at pages 41-44 also connects them.

38

elements of both punishment and forfeiture. *See Penalty*, *Webster's II New College Dictionary* 812 (1999) (defining "penalty" as "[a] punishment established by law or authority for a crime or offense" and "[a] forfeit, esp[ecially] a sum of money, required for an offense"); *Penalty*, *The American Heritage Dictionary of the English Language* 1298 (4th ed. 2006) (defining "penalty" as "[a] punishment established by law or authority for a crime or offense" and "[s]omething, especially a sum of money, required as a forfeit for an offense").

Dictionaries generally define a "fee," as relevant here, as "a fixed charge" or "a sum paid or charged for a service." *Fee*, *Merriam-Webster's Collegiate Dictionary* 459 (11th ed. 2014); *see also Fee*, *New Oxford American Dictionary* 634 (3d ed. 2010) (defining "fee" as "a payment made to a professional person or to a professional or public body in exchange for advice or services"); *Fee*, *Black's Law Dictionary* 758 (11th ed. 2019) (defining "fee" as "[a] charge or payment for labor or services, esp[ecially] professional services"). A "late fee" is thus a fixed charge incurred when a payment is late.

Dictionary definitions of "penalty" and "fees" all generally support Westminster's contention that the 5% penalty referred to in § 8-208(d)(3)(i), referred to elsewhere as a late fee, may be charged automatically upon a tenant's failure to pay rent when due, without regard to actual harm. That "penalty" is sometimes equated to "punishment" also supports Westminster's contention that the amount is intended to be punitive, and so should be chargeable to a tenant in addition to any costs a landlord incurs because of a tenant's failure to timely pay rent. But definitions equating "penalty" with a forfeiture and "fee" generally

39

with fixed charges beg the question of whether such amounts are intended to be separate from, or instead to be a substitute for, any amounts actually incurred because of a tenant's late payment. Nothing in the broader context of the statutory scheme helps resolve that question. We therefore turn to legislative purpose as reflected in statutory text.

The apparent legislative purpose underlying § 8-208 is to regulate leases for residential property in Maryland for the protection of tenants. It does so by, among other things: (1) mandating that landlords who lease five or more dwellings use written leases, Real Prop. § 8-208(a); (2) mandating that proposed leases be made available upon request, *id.* § 8-208(b); (3) mandating that leases include certain statements concerning the habitability and safety of the premises, and the landlord's and tenant's respective obligations concerning utilities and repair, *id.* § 8-208(c); and (4) mandating transparency concerning automatic renewal provisions, permitting local jurisdictions to enact broader rights and remedies, and rendering prohibited terms "unenforceable by the landlord," *id.* § 8-208(e), (f), & (g). Each of these provisions protects tenants.

Consistent with these other provisions of § 8-208, subsection (d) protects tenants in residential properties by identifying ten types of provisions landlords are prohibited from including in leases. As such, we construe it liberally to further its protective purpose. Consequently, when choosing between the Tenants' proposed interpretation of § 8-208(d)(3)(i)—which limits the total amount of fees that a landlord can recover for a tenant's late payment of rent—and Westminster's proposed interpretation—which permits a landlord to recover both a fee as punishment for late payment and uncapped additional

40

amounts the landlord may incur—the apparent legislative purpose favors the former. Indeed, to adopt Westminster's proposed interpretation of § 8-208(d)(3)(i), we would need to accept that the General Assembly intended to authorize provisions in residential leases that permit landlords to:  (1) be made whole for any direct losses by recouping all fees and costs expended in pursuing collection; *and*, on top of that full recovery, (2) impose an additional penalty, not associated with any loss to the landlords, to punish tenants.  Nothing in the statutory scheme supports that punitive interpretation of § 8-208(d)(3)(i).

Our consideration of apparent legislative purpose thus favors the Tenants' interpretation of § 8-208(d)(3)(i).  However, the General Assembly's use of the term "penalty," and that term's use in referring to purely punitive measures in some contexts, causes us to conclude that there is at least some ambiguity in the statutory language.  We therefore turn to legislative history in search of indicia that may resolve that ambiguity. *Wheeling v. Selene Fin. LP*, 473 Md. 356, 377 (2021).  As we will see, the scant legislative history that exists also favors the Tenants' interpretation.

The General Assembly enacted Real Property § 8-208 in 1974 "in response to the recommendations of the Governor's Landlord-Tenant Laws Study Commission." *McDaniel v. Baranowski*, 419 Md. 560, 579 (2011).  The stated purpose was to "prohibit[] certain types of provisions in residential leases, such as . . . penalties for late payments[.]" 1974 Md. Laws, ch. 375.  As originally enacted, § 8-208(a)(3), the predecessor to the current § 8-208(d)(3), prohibited:

41

> A provision providing for a penalty for the late payment of rent in excess of 5% of the amount of rent due for the rental period for which the payment was delinquent. In the case of leases under which the rent is paid in weekly rental installments a penalty of $5 may be charged for the late payment of rent. However, such late penalties shall constitute, in the aggregate, no more than $10 per month.

1974 Md. Laws, ch. 375.

Although the first sentence of the 1974 law has remained unchanged, an early amendment altering the remainder of the provision is informative. In 1979, the Study Commission recommended an amendment to (1) eliminate the $10 aggregate cap on "late penalties" and (2) decrease the amount of the penalty that could be charged with respect to each late payment on a weekly tenancy. The "Explanation and Justification" the Study Commission identified for the change is telling:

> At present, section 8-208(a)(3) provides that a landlord can charge a week to week tenant a $5 penalty for late payment of rent and can charge all other tenants a late payment penalty of 5% of the rent due for the rental period for which the payment was delinquent. The section **however**, specifies that $10 is the maximum aggregate amount of late payment penalties that a landlord can charge a tenant in one month. The Commission proposes repeal of this limitation on the amount of late payment penalties that a landlord can charge a tenant per month *because the Commission was advised that the landlord's costs in collecting rent that is past due in most cases exceeds the amount of late payment penalties permitted to be charged by section 8-208(a)(3) per month.*

Letter from Steven G. Davidson, Reporter of Governor's Landlord-Tenant Laws Study Commission, to Judson P. Garrett, Jr., Chief Legislative Officer, and attached materials, (Sept. 13, 1979) (on file with the Maryland State Law Library) (italics added).[27]

The following year, upon considering the Study Commission's recommendations, the General Assembly: (1) eliminated the $10 per month aggregate cap on all late payment penalties; (2) with respect to monthly tenancies, left in place the maximum 5% penalty that could be charged for late payments on monthly tenancies; and (3) with respect to weekly tenancies, lowered the maximum late payment penalty to $3, subject to a new aggregate monthly cap of $12 applicable only to weekly tenancies. 1980 Md. Laws, ch. 65. The Study Commission's 1979 proposal is one of the few items in the bill file for the House bill that amended the statute. Bill File for H.B. 336, 1980 Leg. (1980).

In sum, with respect to monthly tenancies, the Study Commission proposed that the General Assembly amend the statute by eliminating the $10 cap on the 5% penalty for the express purpose of better reflecting the costs incurred by landlords in collecting rent. In response to the Study Commission's report, the General Assembly did just that. Lacking any other insight from the legislative history, this episode provides persuasive support for

---

[27] The Study Commission proceeded to address a concern specific to week-to-week tenancies, which was the need to strike a balance between, on one hand, a landlord's high costs of collecting rent that might be late as many as four or five times a month, and, on the other hand, the effect of imposing those costs on week-to-week tenants, most of whom "have low and undependable incomes and tight budgets[.]" *Id.* The Study Commission recommended a compromise position of reducing the amount of penalty that could be charged such tenants on a weekly basis to $3, which would effectively impose a monthly cap of $12 or $15, depending on how many times rent came due that month. *Id.*

the Tenants' proposed interpretation of § 8-208(d)(3)(i) as encompassing a landlord's costs of collection.

Westminster maintains that this interpretation of § 8-208(d)(3)(i) is unreasonable because it would prevent Westminster and other landlords from recovering all of their hard costs in pursuing summary ejectment, which can, in some cases, exceed 5% of the monthly rent. For several reasons, we disagree with Westminster. First, a landlord is not required to incur hard costs to pursue summary ejectment every time a tenant is late paying rent, and our interpretation of the statute is not influenced by Westminster's decision to do so. Indeed, in cases in which a landlord charges a fee for a late payment but does not hire an agent to pursue summary ejectment before the tenant becomes current on rent, the landlord comes out ahead under our interpretation of § 8-208(d)(3)(i). Second, in arguing that its hard costs may exceed 5% of monthly rent, Westminster includes hard costs that would qualify as court costs that a court may ultimately award it under Real Property § 8-401(e)(2)(iv). Third, Westminster has not pointed to any authority that restricts the General Assembly from limiting a landlord's ability to fully recover its costs in pursuing summary ejectment. Fourth, Westminster can call upon the General Assembly to increase the amount of the permitted penalty/late fee or, if it believes we have misinterpreted the General Assembly's intent, to clarify that § 8-208(d)(3)(i) does not prohibit landlords from recovering both a 5% penalty and costs of collection.

In sum, Real Property § 8-208(d)(3)(i) precludes a landlord from including provisions in a lease permitting it to charge late penalties or fees greater than 5% of the

rent due for the period at issue. When a lease provides for a 5% late penalty/fee, the lease may not also permit the landlord to charge additional fees triggered by late payment. Section 8-208(d)(3)(i) does not, however, preclude a landlord who prevails in a summary ejectment proceeding from recovering fees properly awarded as court costs, as provided in Real Property § 8-401(e).

## II. CLASS CERTIFICATION

### A. Standard of Review and Legal Framework

A trial court's decision regarding certification of a class action is ordinarily reviewed for an abuse of discretion. *Creveling v. Gov't Emps. Ins. Co.*, 376 Md. 72, 90 (2003). "However, whether the trial court used a correct legal standard in determining whether to grant or deny class certification is a question of law," which we review without deference. *Id.*

Maryland Rule 2-231 governs class action lawsuits. Because the Rule is similar to Rule 23 of the Federal Rules of Civil Procedure, we consider interpretations of the federal rule to be helpful to our analysis. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 724 (2000). Like its federal analogue, Rule 2-231(b) establishes four prerequisites to the maintenance of any class action, which we have previously summarized as:

> numerosity (the class is so numerous that joinder of all members is impracticable); commonality (there are questions of law or fact common to the class); typicality (the claims or defenses of the representative parties are typical of the claims or defenses of the class); and adequacy of representation (the representative parties and counsel will fairly and adequately protect the interests of the class).

*Angeletti*, 358 Md. at 727.  In addition to those prerequisites, a proposed class must also satisfy one of three subsections of Rule 2-231(c), two of which are relevant here:

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . .

Md. Rule 2-231(c)(2), (3).

Rule 2-231(d) requires a court to "determine by order as soon as practicable after commencement of the action whether it is to be maintained as a class action."[28]  It further mandates that the court hold a hearing on the issue if requested by any party and explain in its order resolving the motion its "findings and reasons for certifying or refusing to certify the action as a class action."  *Id.*  Any such order may be conditional and, in any event, "may be altered or amended before the decision on the merits."  *Id.*

### B.    *Procedural Background*

The Tenants contend that the circuit court erred in refusing to consider the merits of their second revised motion for class certification and abused its discretion in denying the motion.  Getting to the merits of that contention requires further procedural background.

---

[28] Although Federal Rule of Civil Procedure 23 once mirrored this language in Rule 2-231(d), the federal rule now requires certification "[a]t an early practicable time" after suit is initiated.  Fed. R. Civ. P. 23(c)(1)(A); 3 *Newberg and Rubenstein on Class Actions* § 7:33 (6th ed. 2022).

46

The Tenants filed three motions for class certification in the circuit court. The court did not rule on the original motion before it was rendered moot by the filing of the Tenants' second amended complaint. The Tenants then filed a revised motion for class certification (the "First Class Motion") in which they sought certification under Rule 2-231(c)(3). The Appellate Court aptly summarized the defendants and claims in the second amended complaint as follows:

> The defendants named in the complaint were Westminster and the owners of the apartment and townhouse properties where the plaintiffs resided, *i.e.*, Carroll Park Holdings, LLC, Dutch Village, LLC, Pleasantview, LLC, Whispering Woods #299 Limited Partnership, and Whispering Woods #250 Limited Partnership. [Tenants] alleged that Westminster was the property manager for each development.
>
> The second amended complaint contained seven counts, setting out the following claims with each count directed to all the defendants:
>
> 1. damages for the defendants' alleged violations of Real Prop. § 8-208;
>
> 2. damages for the defendants' alleged violations of the Maryland Consumer Debt Collection Act by:
>
> > (a) attempting to enforce a right with knowledge that the right does not exist, in violation of Com[mercial] Law § 14-202(8); and
> >
> > (b) communicating with debtors "with the frequency, at the unusual hours, or in any other manner as reasonably can be expected to abuse or harass the debtor" in violation of Com[mercial] Law § 14-202(8);
>
> 3. damages for the defendants' alleged violations of the Maryland Consumer Protection Act by:
>
> > (a) engaging in unfair and deceptive trade practices (in violation of Com[mercial] Law § 13-303(6))[;] and
> >
> > (b) violating the Maryland Consumer Debt Collection Act, which is a *per se* violation of the Maryland Consumer Protection Act, *see* Com[mercial] Law § 13-301(14)(iii);

47

4. unjust enrichment and restitution claims against each defendant;

5. damages for breach of contract by improperly charging the 5% late fee and other fees;

6. a separate breach of contract claim regarding charging the $12 agent's fee; and

7. declaratory and injunctive relief.

*Smith v. Westminster Mgmt., LLC*, 257 Md. App. 336, 412-13 (2023).

Although the second amended complaint named seven defendants, the Tenants sought class certification against only the two Westminster entities. The Tenants' proposed class definition at the time the court considered their motion was:

> All persons who are or were tenants in a residential rental property in Maryland managed by Westminster Management, LLC and/or JK2 Westminster, LLC, and who, since September 27, 2014, have been charged one or more of the following fees by Westminster and/or JK2 Westminster: agent fee, summons fee, writ fee, warrant fee, legal fee, court fee, and/or filing fee.

The Tenants excluded from this definition employees of the defendants and their relatives and certain individuals granted bankruptcy discharges.

In April 2019, the court denied the Tenants' First Class Motion in a thorough 18-page written order. Although the court found that the Tenants had satisfied the requirements of numerosity, commonality, and adequacy of representation by counsel, it concluded that they had not satisfied the "implicit requirement" of "pleading a sufficiently definite class," and did not satisfy typicality, adequacy of representation by the named plaintiffs, predominance of common questions over individual questions, or superiority.

48

The court specifically identified the following as the reasons for denying the First Class Motion:

- The Tenants' proposed class definition was not definite and ascertainable because determining class membership would require individual mini-trials to inquire into (1) whether fees were charged in connection with failure to pay rent actions or other types of actions; (2) whether individual tenants paid the fees (which the court found particularly relevant to the Tenants' unjust enrichment claim); and (3) whether the practices Westminster was alleged to have engaged in were used at all Westminster properties;

- There was insufficient proof that Westminster's alleged practices were applied to all 17 of its Maryland properties and therefore no showing that the Tenants' claims were typical of those of the class;

- The five defendants as to whom the Tenants did not seek class certification might raise unique defenses that would likely be a major focus of the case;

- In their Consumer Debt Collection Act claim, the Tenants' allegations that Westminster attempted to collect debts using threats and communicated with debtors in a harassing manner could not be proven on a class-wide basis;

- The Tenants' unjust enrichment claim would require individualized assessments of whether each tenant paid the charged fees and when the alleged benefits were conferred;

- The Tenants' claims for consequential damages would need to be assessed individually through complex expert testimony;

- The common questions the Tenants identified concerning whether Westminster charged illegal fees, misallocated rent payments, and improperly threatened evictions would require individualized evidence and fact-finding;

- The class included public housing tenants who are not charged a late fee and are subject to other federal rules; and

- Due to the proliferation of individual issues, the Tenants had not shown that a class action would be manageable.

In response to the court's denial of their First Class Motion, the Tenants filed a third amended complaint and second revised motion for class certification (the "Second Class

Motion").[29]  As explained in the motion, the Tenants made a number of changes to their claims and proposed class definition that specifically addressed the stated bases upon which the court denied their prior motion.  The Tenants narrowed their proposed class definition to:  (1) embrace only disputed fees related to the late payment or non-payment of rent; (2) include only tenants who paid such fees; (3) exclude tenants relying on housing assistance; and (4) exclude tenants who had released or waived all claims against Westminster.  The Tenants also dropped from the third amended complaint:  (1) all defendants other than Westminster; (2) their unjust enrichment count; (3) their request for consequential damages; and (4) the basis for liability under the Consumer Debt Collection Act relying on Westminster's alleged use of threats and harassing communications.  The Tenants also added factual support for their contention that Westminster's alleged practices were uniform across their Maryland properties in the form of deposition testimony of two Westminster corporate deponents.[30]

---

[29] Westminster moved to strike the third amended complaint on the ground that it was untimely, but the circuit court denied that request.  The circuit court did not identify the timeliness of the Tenants' third amended complaint or the associated Second Class Motion as reasons for denying the motion.

[30] In their briefing on class certification, the parties disputed the proper characterization of the testimony of these witnesses.  The Tenants emphasized the witnesses' testimony concerning Westminster's use of form leases and a common management system to generate leases, Westminster's ability to identify tenants who had paid agent fees and writ fees it had refunded, general testimony that Westminster charges the fees at issue to all tenants who are late paying rent, and the deponents' inability to identify differences relevant to the Tenants' claims.  Westminster emphasized the deponents' repeated, non-specific testimony that leases are different and can be individualized, that they could not answer general questions without consulting individual

50

The circuit court, treating the Second Class Motion as a motion for reconsideration, denied the motion without a hearing in a one-and-a-half-page order that did not address the merits of the motion. Instead, the court denied the motion on the grounds that (1) the Tenants had not identified any compelling reason to reconsider the prior ruling; (2) the new deposition testimony, although it bolstered the Tenants' arguments, did not warrant reconsideration of class certification; and (3) the third amended complaint "does not materially change the circumstances of the case."

The Appellate Court held that the circuit court erred in applying a reconsideration standard because "[Tenants] made several changes to the way that they framed their causes of action and their proposed class definition to address several of the concerns identified by the circuit court in its prior decision." *Smith*, 257 Md. App. at 418. The intermediate appellate court ultimately held that the Tenants may file a new motion for class certification upon remand. *Id.* at 420. Relying on this Court's decision in *Chavis v. Blibaum & Associates, P.A.*, 476 Md. 534, 579 (2021), the Appellate Court held that its rulings that the named plaintiffs had asserted viable claims against Westminster meant "the legal landscape confronting the circuit court ha[d] changed significantly," such that a new motion was warranted. *Smith*, 257 Md. App. at 418-20.

---

tenant leases, and that questions about particular fees paid by tenants could be answered only by an in-depth examination of each tenant's ledger.

51

## C.    *Addressing Multiple Motions for Class Certification*

The Tenants argue that the circuit court erred in treating their Second Class Motion as a motion for reconsideration. As explained at oral argument, they contend that a plaintiff is entitled to file a new motion for class certification at least each time a complaint is amended, and that regardless of the number filed, a trial court must treat every motion for class certification as a new motion to be considered on its own merits, including holding a hearing if requested and issuing a written order explaining the court's findings and reasons pursuant to Rule 2-231(d). Westminster contends that the circuit court properly treated the Second Class Motion as a motion for reconsideration and properly denied it without a hearing or further explanation. We do not agree fully with either party.

We have not had occasion to determine the appropriate standard for a circuit court to apply to a motion concerning class certification after the court has ruled on an earlier such motion. Here, the circuit court applied a material change in circumstances test to determine whether it would consider the merits of the second motion. That comports with the standard applied by many federal district courts, it is consistent with Rule 2-231, and it strikes an appropriate balance between accommodating changes in circumstances and judicial efficiency. We therefore agree with the circuit court's articulation of the appropriate standard.

Rule 2-231 does not identify a standard for a trial court's consideration of subsequent motions concerning class certification after it has ruled on an earlier motion. However, in providing that any order certifying or refusing to certify a class "may be

52

conditional and may be altered or amended before the decision on the merits," the Rule plainly anticipates that such subsequent motions may be filed and considered on their merits. Md. Rule 2-231(d); *see also Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("Under [Federal] Rule 23 the district court is charged with the duty of monitoring its class decisions in light of the evidentiary development of the case. The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts."); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1273-74 (11th Cir. 2000) (in discussing interlocutory appeals, noting that "class certification determinations are so fluid and fact-sensitive that district courts should be encouraged rather than discouraged from reassessing whether the prerequisites of [Federal] Rule 23 exist and whether a class action is the most efficacious way to resolve the dispute").

Seeking to balance the need to fairly respond to changes in circumstances with concerns for judicial efficiency, some federal courts apply a "motion for reconsideration" standard to subsequent motions related to class certification, requiring that the movant identify a material change in circumstances before the court will revisit the merits of an earlier decision. *See, e.g.*, *Hartman v. United Bank Card, Inc.*, 291 F.R.D. 591, 597 (W.D. Wash. 2013) (stating that a change in circumstances is required for a court to reconsider a class certification decision); *Terrill v. Electrolux Home Prods., Inc.*, 274 F.R.D. 698, 700 (S.D. Ga. 2011) (stating that revisiting a class certification decision is appropriate if required by subsequent developments, upon a showing of new evidence or other grounds, or upon a demonstration of changed circumstances); *Washington v. Vogel*, 158 F.R.D. 689,

692-93 (M.D. Fla. 1994) (denying a renewed motion for class certification because, among other defects, no changed circumstances justified reconsideration of the issue); *Cabrera v. Gov't Employees Ins. Co.*, No. 12-61390-CIV, 2015 WL 464237, at *4 (S.D. Fla. Jan. 16, 2015) ("Generally, a Court 'may revisit a prior denial of a class certification motion if there is a change in the circumstances or facts since the prior denial.'" (quoting *Barton v. RCI, LLC*, No. 10-CV-03657 PGS, 2014 WL 5762214, at *1 (D.N.J. Nov. 5, 2014) (emphasis omitted))).[31]

Such a standard does not erect a high barrier to revisiting the merits of class certification when, for example, plaintiffs make material changes to their proposed class definition or a party identifies new evidence or other changes in circumstance that are material to the certification issue. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007) ("[O]ur ruling rejected class certification only of the class as certified by the District Court. Nothing in our decision precludes the Petitioners from returning to the District Court to seek certification of a more modest class, one as to which the Rule 23 criteria might be met, according to the standards we have outlined."); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 458 (11th Cir. 1996) ("Of course, if, through further proceedings, the plaintiffs are able to clarify and better support the need for class certification, the district

---

[31] By contrast, the United States Court of Appeals for the Third Circuit has expressly rejected this motion for reconsideration standard, holding that the plain language of Rule 23 "allows for multiple bites at the apple throughout the litigation, and . . . does not impose an additional requirement on parties to prove a change in law or show new evidence to succeed on a renewed motion for certification." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 476 (3d Cir. 2020).

court remains free to revisit the issue."). Nor is this standard so low as to require a court to consider repetitive filings that are not materially different or to accommodate gamesmanship.

We agree that a material change in circumstances test to revisit the merits of a decision concerning class certification strikes a proper balance and is consistent with Rule 2-231. Requiring a court to revisit the merits of an earlier decision absent a material change in circumstances would often waste judicial and party resources without any substantial prospect that the court might reach a different decision. On the other hand, imposing too high a barrier before a court may revisit the merits of class certification would inappropriately either foreclose the possibility of class treatment in a case in which it is appropriate or require class treatment in a case in which it is not. A material change in circumstances might accompany, among other things, alone or in combination, a substantial change in the proposed class definition, new evidence obtained through discovery, an intervening change in the law, or a relevant change in the legal landscape of the case as a result of the plaintiffs modifying their claims or receiving rulings on motions, provided that any such change is material to the certification issue.

Given that an initial decision on class certification must be made "as soon as practicable after commencement of the action," Md. Rule 2-231(d), and that the appropriateness or not of class certification may not be fully apparent until the parties have engaged in discovery and the nature of the claims to be litigated has been settled through motions practice, it would be particularly unfair to erect too high a barrier to revisiting such

55

a decision in light of subsequent developments. In appropriate cases, class actions can serve as essential tools for the pursuit of claims that otherwise would never be brought and the vindication of rights that otherwise would be lost. In inappropriate cases, class actions can impose extraordinary burdens on defendants and courts with perverse results driven by the costs and risks of litigation rather than the merits of claims. Especially because in Maryland, unlike in federal court, decisions on class certification are not subject to interlocutory review, getting to the right answer on class certification is more important than imposing an arbitrary barrier to reach finality on that issue at an early stage of litigation.

Here, although we agree with the standard the circuit court articulated to determine whether to revisit the merits of class certification, we hold that the court erred in its application of that standard. The circuit court's articulated reasons for denying the Second Class Motion included an uncertain class definition, a lack of evidence that the conduct at issue applied to all properties managed by Westminster, and the Tenants' inclusion of claims and requests for relief that were not amenable to class treatment. In response, the Tenants presented new evidence concerning the breadth and uniformity of Westminster's conduct and made substantial changes to both their proposed class definition and their claims, including dropping claims and a request for relief the court had identified as not amenable to class treatment. In doing so, the Tenants fully addressed several of the issues the court identified in denying class certification and at least partially addressed others. In light of the reasons the circuit court provided for its initial decision on class certification,

those changes constituted a material change in circumstances.[32] As a result, the circuit court should have addressed the merits of the Second Class Motion.

For guidance on remand, we offer three additional points. First, our decision is that the circuit court must address the merits of the Second Class Motion, including holding a hearing if requested and issuing a written decision explaining its findings and reasons. Whether the court grants the motion is a matter left to its sound discretion. Second, in reviewing a subsequent motion concerning class certification, a court is not limited to considering the grounds on which it granted or denied an earlier motion. Issues the court did not feel the need to address in an initial ruling may take on new importance given the materially changed circumstances justifying the subsequent motion. Third, a part of the circuit court's analysis of the revised motion for class certification here was that determining class membership would require a series of "mini-trials." A mini-trial, in this context, is a proceeding that would involve "extensive and individualized fact-finding," thus rendering a class action "inappropriate." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).

---

[32] It is also significant to our analysis that the court had ruled only once on class certification before the Tenants filed the Second Class Motion. This was not an attempt by the Tenants to have a third, fourth, or fifth bite at the proverbial apple. Though Westminster repeatedly states that Tenants had "nine attempts" at defining the class, in reality, the circuit court had only two opportunities to rule upon the issue, the First Class Motion and the Second Class Motion. Relatedly, we do not suggest that a putative class representative would or should be permitted to intentionally seek certification of an overly broad class and then progressively narrow the definition until the court finds it acceptable. In an appropriate case, a court could reasonably exercise its discretion to refuse to consider subsequent motions.

The need to review Westminster's tenant ledgers to identify whether tenants were charged particular fees is not necessarily the same as requiring mini-trials, at least as long as review of the corporate records would produce an objective answer concerning whether the tenants were charged those fees without the need to test the evidence extensively or resolve complex disputes.[33]  *See id.* at 358 ("A class cannot be certified unless a court can readily identify the class members in reference to objective criteria."); *Kelly v. RealPage Inc.*, 47 F.4th 202, 224 (3d Cir. 2022) ("[A] straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources."); *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 441 (3d Cir. 2017) ("Affidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard.").

---

[33] Because we decide that the circuit court erred in not addressing the merits of the Tenants' Second Class Motion, we need not address the Appellate Court's reliance on our decision in *Chavis*.  We note, however, that this case is in a different procedural posture.  In *Chavis*, the circuit court had dismissed all but one of the plaintiff's claims before deciding the class certification motion.  476 Md. at 546, 578-79.  In reviving the dismissed claims, this Court therefore altered the legal landscape relevant to the class certification decision.  *Id.* at 545-47, 579.  Here, the circuit court rendered its class certification decision before dismissing any of the Tenants' claims, and the grounds on which it ruled on class certification did not depend on its views of the merits of those claims.  Unlike in *Chavis*, therefore, the Appellate Court's decision on the merits of the Tenants' claims did not alter the legal landscape as it existed at the time of the court's decision on class certification.

In sum, the Tenants' Second Class Motion presented a material change in circumstances from the motion the circuit court had previously denied. The court thus should have considered the motion on its merits.

## III.  THE TENANTS' CROSS PETITION

In their cross petition, the Tenants argue that they are entitled to summary judgment as to liability on their statutory and breach-of-contract claims. The Appellate Court did not address that contention, on the ground that the Tenants did not meaningfully argue it. *Smith*, 257 Md. App. at 380 n.38. The Tenants disagree and, in their brief before this Court, point out that in their opening brief in the Appellate Court they "repeatedly argued that the circuit court had improperly denied their motion for summary judgment and that the Appellate Court 'should . . . enter summary judgment in [their] favor.'"  (Alterations in original).

We agree with the Appellate Court that the Tenants did not adequately present to that court their claim that the circuit court erred in denying their motion for summary judgment. In the standard of review section of the Tenants' opening brief before the Appellate Court, they identified the standard of review applicable to appellate review of the grant of a motion for summary judgment. They did not identify, there or anywhere else in their brief, the different standard of review applicable to the denial of summary judgment.[34]  And although the Tenants did state in several places in their Appellate Court

_____

[34] While the grant of summary judgment is reviewed without deference to the trial court, *Bd. of County Comm'rs of St. Mary's County v. Aiken*, 483 Md. 590, 616 (2023), the

brief that the circuit court had erred in denying their motion for summary judgment, they did so only as an add-on, without any further analysis or explanation, at the conclusion of each of their arguments that the circuit court had erred in granting Westminster's motion for summary judgment. That was insufficient to meet the Tenants' obligation "to articulate and adequately argue all issues the appellant desires the appellate court to consider in the appellant's initial brief." *Oak Crest Vill., Inc. v. Murphy*, 379 Md. 229, 241 (2004); *see also DiPino v. Davis*, 354 Md. 18, 56 (1999) ("[I]f a point germane to the appeal is not adequately raised in a party's brief, the court may, and ordinarily should, decline to address it." (citing *Health Serv. Cost Rev. v. Lutheran Hosp.*, 298 Md. 651, 664 (1984))); Md. Rule 8-504(a)(6) ("A brief shall . . . include . . . [a]rgument in support of the party's position on each issue."). Accordingly, the Appellate Court did not err in declining to decide whether the Tenants were entitled to an award of summary judgment and that issue was not preserved for consideration by this Court.

## CONCLUSION

For these reasons, we hold:

1. For purposes of Real Property § 8-401 as applied to residential leases, "rent" consists of a tenant's fixed, periodic payments to a landlord for the use or possession of rented property;

2. A clause in a lease that purports to permit a landlord to allocate a tenant's payment of "rent" to an obligation other than "rent" violates Real Property § 8-208(d)(2) to the extent it would allow that landlord to bring a summary

---

denial of summary judgment is reviewed for an abuse of discretion, *Dashiell v. Meeks*, 396 Md. 149, 165 (2006).

ejectment proceeding based on allegedly overdue "rent" that the tenant had already paid;

3. A residential lease that permits a landlord to charge a penalty/late fee of 5% of the rent due in the period at issue may not also permit the landlord to charge additional fees incurred in connection with filing a summary ejectment action (other than awarded court costs) or otherwise conditioned upon nonpayment of rent;

4. A circuit court should generally consider the merits of a timely motion concerning class certification if the motion is based on a material change in circumstances and is not otherwise deficient. Here, the circuit court erred in not ruling on the merits of the Tenants' second revised motion for class certification; and

5. The Appellate Court did not err in declining to address the circuit court's denial of the Tenants' motion for summary judgment.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**

Circuit Court for Baltimore City
Case No. 24-C-17-004797
Argued: November 6, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 4

September Term, 2023

_____

WESTMINSTER MANAGEMENT, LLC,
et al.

v.

TENAE SMITH, et al.

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Gould,
Eaves,
Harrell, Glenn T., Jr. (Senior
    Justice, Specially Assigned),

JJ.

_____

Dissenting and Concurring Opinion by
Gould, J., which Harrell, J., joins.

_____

Filed: March 25, 2024

I join parts I and III of the Majority's opinion and respectfully dissent, in part, to part II of the Majority's opinion. As explained below, I would affirm the circuit court's denial of the Tenants' second motion for class certification (the "Second Class Motion").

The Majority holds that a motion to revisit the merits of the circuit court's grant or denial of class certification should be reviewed under the material change in circumstances test, which is applicable to motions for reconsideration. The Majority finds that the circuit court correctly articulated the standard but erred in its application. Specifically, according to the Majority, because the Second Class Motion "presented a material change in circumstances from the motion the circuit court had previously denied[,]" the circuit court "should have considered the motion on its merits." Maj. Op. at 59. On remand, the circuit court is now required to hold a hearing, if requested, and issue "a written decision explaining its findings and reasons." Maj. Op. at 57.

I agree with the Majority that the material change in circumstances test is the correct standard to apply. I disagree with the Majority's analysis and disposition of part II of the opinion in four respects.

1

I believe the circuit court *did* consider the Second Class Motion on its merits. The circuit court expressly stated:

Upon consideration of [the Second Class Motion, Westminster's Opposition, and the Plaintiffs' Reply] it is . . . hereby:

ORDERED that [the Second Class Motion] is DENIED for the following reasons:

1. No compelling reasons exist for a *de novo* hearing or a reconsideration based on Plaintiffs' claim of newly discovered evidence and the filing of the Third Amended Complaint. Plaintiffs' request to have a *de novo* hearing is a request to have the court reconsider its April 22, 2019 order. Plaintiffs argue that "[t]his new information directly bolsters Plaintiffs' arguments as to typicality and predominance . . . results in circumstances warranting this Court's reconsideration . . .[.]" This court finds that Plaintiffs request is absent any materially changed or clarified circumstances to support a reconsideration. Plaintiffs failed to show a significant, unexpected change in the facts or the law. Plaintiffs make the same Maryland Rule 231 arguments as were made in the initial motion for class certification. The fact that the depositions bolster their arguments does not warrant a change or reconsideration of the court's initial denial of class certification.

2. Plaintiff's' Third Amended Complaint does not materially change the circumstances of the case to convince the court to reconsider or alter and amend its April 22, 2019 order.

3. A hearing on the motion or revising the motion will not promote judicial economy.

The opening words "[u]pon consideration of," followed by the list of filings, can be interpreted in only one way—that the court did, in fact, consider each of the listed filings.

Moreover, that the court considered the Second Class Motion is also reflected in another part of the court's order:

This court finds that [the Tenants'] request is absent any materially changed or clarified circumstances to support a reconsideration. Plaintiffs failed to show a significant, unexpected change in the facts or the law.

In order to draw a conclusion about the materiality of the new evidence submitted by the plaintiffs or to determine whether the plaintiffs showed "a significant, unexpected change in the facts[,]" the court would have had to review and consider such evidence.

2

The circuit court had reason to conclude that the changes to the plaintiffs' complaint and proposed class definition were not material changes warranting a do-over. The Majority asserts that plaintiffs "presented new evidence concerning the breadth and uniformity of Westminster's conduct and made substantial changes to both their proposed class definition and their claims, including dropping claims and a request for relief the court had identified as not amenable to class treatment." Maj. Op. at 56. "In doing so," the Majority asserts, "the Tenants fully addressed several of the issues the court identified in denying class certification and at least partially addressed others." *Id.* According to the Majority, "those changes constituted a material change in circumstances." *Id.* at 57.

I agree that changes to pleadings and class definitions as well as newly discovered evidence *could* rise to the level of a material change in circumstances warranting reconsideration of an order granting or denying class certification. But under the circumstances presented here, where the defects in the pleadings and the class definition were extensively addressed in the motion papers prior to the court's initial ruling, the court had the discretion to decline to reconsider its ruling.

In class action cases, it is expected that the class plaintiffs will advance what they believe will be the most advantageous and appropriate class definition, and that the defendants then highlight the perceived problems with the proposed definition and explain why the case is not suitable for a class action. The class plaintiffs can amend their proposed definition and the pleadings to address the defects alleged by the defendants or can stick to their guns and let the court decide. If the class plaintiffs choose the latter, they should not

be entitled to an automatic do-over to rectify the problems after the court sides with the defendant.

Here, as shown in the table below, the deficiencies that the court eventually found to be disqualifying had previously been raised by the defendants in either their first or second oppositions, yet the Tenants chose not to correct those shortcomings prior to the court's first order.

| Elements | First Order Denying Certification | Defendants' Opposition |
|---|---|---|
| Definitiveness (Md. Rule 2-231(b)) | • The proposed class would require an inquiry and mini-trials into (1) "whether the fees were charged in other types of cases," (2) whether the fees were actually paid by potential class members, and (3) whether the practices occurred at all Westminster-managed properties. | • The proposed class cannot be objectively identified without first conducting an individual analysis of liability and damages. This includes "whether those fees were 'related to the alleged late payment or non-payment of rent[.]'"<br>• "Plaintiffs' proposed class definition is inherently overbroad. Specifically, Plaintiffs' proposed class definition seeks to include all individuals who were 'charged fees,' regardless of whether the putative class member actually *paid* such fees[.]"<br>• Additionally, "[p]laintiffs have produced no *evidence* to establish their contention that the claims or situations of" the five named plaintiffs, who resided at four of Westminster's properties, are typical of the claims "of tenants who resided at the other 13 Westminster-managed properties." |
| Typicality and Adequacy (Md. Rule 2-231(b)(3), (4)) | • There is insufficient evidence that the alleged illegal fees had been charged at all 17 Westminster properties.<br>• Since Westminster and JK2 Westminster were the only defendants against whom class certification was sought, other | • Evidence shows that the practices occurred at only four of the 17 properties.<br>• "Plaintiffs have proposed an unmanageable procedural situation by seeking to certify their class against only Westminster and JK2 |

| Elements | First Order Denying Certification | Defendants' Opposition |
|---|---|---|
| | non-class defendants could have unique defenses to the individual claims of certain tenants that could not be proven on a class-wide basis.<br><br>• Other individualized defenses that could be raised are: (1) whether a tenant received rental assistance and thus was not charged a fee; (2) whether a class member owed Westminster money in excess of any amount recovered; and (3) whether a class member had already waived their claims against Westminster.<br><br>• Plaintiff H. Smith's individual Maryland Consumer Debt Collection Act ("MCDCA") claim based on alleged harassment could not be proven on a class-wide basis. | Westminster and not the other Defendants named in the Second Amended Complaint."<br><br>• Plaintiffs' class fails to account for individualized tenant circumstances, including whether "tenants: (1) receive rental assistance; (2) owe Westminster money in excess of the allegedly improper fees; and/or (3) waived and/or released their rights to assert the claims alleged[.]"<br><br>• Individualized fact-finding is required to determine if the defendants ever communicated with a class member with frequency or at unusual hours to harass. The court and both parties recognized this deficiency, as plaintiffs agreed to amend their complaint to drop the MCDCA claim if the class was certified. |
| Predominance (Md. Rule 2-231(c)(3)) | • The plaintiffs' harassment-based claims under the MCDCA and their claims for unjust enrichment—especially where the tenant would ultimately be required to pay the fees— required individualized fact-finding to be proven.<br><br>• The consequential damages demand based on the landlord charging the Tenants the alleged-illegal fees was not simplistic and | • Individualized fact-finding is required, such as whether the defendants ever communicated with a class member with frequency or at unusual hours to harass.<br><br>• Plaintiffs' class definition "fails to account for the unique circumstances associated with individual tenants" such as whether a tenant "owe[s] |

| Elements | First Order Denying Certification | Defendants' Opposition |
|---|---|---|
| | could not be calculated on a class-wide basis. | Westminster money in excess of the allegedly improper fees[.]" <br><br> • "[E]ach putative class member will allege payment of different types of fees in different amounts at different times at different properties." |
| Manageability (Md. Rule 2-231(c)(3)(D)) | • "[T]he manageability requirement fails in that the Plaintiffs have only moved for class action against two of seven Defendants." | • The class will be unmanageable where the class is certified against only two of the seven defendants. |

In declining to give the Tenants another bite at the apple, the court could certainly have considered that the Tenants had ample time to craft an appropriate definition and tailor their pleadings accordingly. Indeed, over the course of the eighteen months between the filing of the lawsuit and the March 7, 2019 hearing on first revised motion for class certification (the "First Class Motion"), the Tenants submitted eight proposed class definitions.

The definition proposed in the Second Amended Complaint differed from the one offered in the First Class Motion. The Second Amended Complaint included the following class definition[1]:

---

[1] Excluded from the class definition were:

a. those individuals who now are or have ever been executives of defendants and the spouses, parents, siblings, and children of all such individuals; and

>All persons who are or were tenants in a residential rental property in Maryland managed by Westminster and/or JK2 Westminster, and who, since September 27, 2014, have been charged fees by Westminster and/or JK2 Westminster and/or the Owners related to the alleged late payment or non-payment of rent (other than a late fee of no more than 5% of the amount of rent due for the period for which the payment was delinquent and/or actual costs awarded by a court).

This definition included all tenants who had been charged an excessive fee for the late or non-payment of rent by either (1) Westminster Management, LLC; (2) JK2 Westminster, LLC; or (3) any of the entities that were "owners" of the 17 Westminster properties. In contrast, the definition proposed in the First Class Motion omitted the language "and/or the Owners." Recognizing this difference, the Tenants presented a third, further inconsistent definition during the March 7, 2019 hearing. That definition was stated as:

>All persons who are or were tenants in a residential rental property in Maryland managed by Westminster Management, LLC and/or JK2 Westminster, LLC, and who, since September 27, 2014, have been charged one or more of the following fees by Westminster and/or JK2 Westminster: agent fee, summons fee, writ fee, warrant fee, legal fee, court fee, and/or filing fee.

In this revised definition, the Tenants eliminated the owners as class defendants, but this time, contrary to the definitions proposed in the Second Amended Complaint and the First Class Motion, the definition included any tenant that was charged any of the specified fees, even if the court action prompting such fees was unrelated to a failure to pay rent.

---

b. any individual who was granted a discharge pursuant to the United States Bankruptcy Code or state receivership laws after the date of all such improper fees or misallocations of payments.

There were minor alterations to these exclusions throughout the eight class definitions submitted by the Tenants that are not relevant here.

8

When this problem was pointed out by defendants, the Tenants submitted yet another class definition that restored the requirement that the fees had to have been "related to the alleged late payment or non-payment of rent." The circuit court was aware of the Tenants' numerous attempts to craft an appropriate definition and gave the Tenants a fair opportunity to do so.

A change in litigation strategy to respond to an adverse ruling is not a change in circumstances warranting a do-over. The circuit court must manage and allocate its time and resources to give *every* litigant in *every* case a fair opportunity to present their case. Consistent with its duties to determine "as soon as practicable after commencement of the action whether it is to be maintained as a class action[,]" Md. Rule 2-231(d), and to apply the rules "to secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay[,]" Md. Rule 1-201(a), a court should be entitled (but not required) to hold a party to its strategic choices under these circumstances. In my view, the circuit court soundly exercised discretion in doing just that.

3

The circuit court denied the Tenants' First Class Motion in part due to insufficient evidence supporting the typicality requirement, noting that the Tenants' evidence was limited to only four of the 17 Westminster properties. The Tenants attempted to remedy this by submitting then-recent deposition testimony from two additional Westminster employees, which they claimed demonstrated that Westminster's practices were applied to all 17 properties. This was the only evidence that qualifies as newly discovered.

9

Nonetheless, the circuit court had a reasonable basis to conclude that this testimony did not move the needle enough to justify either another hearing or a change in its ruling. In making that decision, the court considered Westminster's opposition to the Second Class Motion, which pointed to deposition testimony that, according to Westminster, demonstrated that Westminster's practices were not sufficiently consistent across the 17 properties to satisfy the typicality requirement. Westminster noted that there were differences between tenant leases, that Westminster's policies varied across properties, and that fees were processed and collected differently depending on the property and tenant.

As we have stated, "[w]e ordinarily review a trial court's decision regarding whether to certify a class action for an abuse of discretion. Implicit in this standard is a recognition that the basis of the certification inquiry is essentially a factual one, and thus, deference is due." *Creveling v. Gov't Emps. Ins. Co.*, 376 Md. 72, 90 (2003) (citations omitted). Confronted with conflicting evidence and arguments, the circuit court had to determine whether the incremental value of the Tenants' new evidence justified a change in its ruling. In stating in its order that "Plaintiffs failed to show a significant, unexpected change in the facts or the law[,]" the court indicated that it did just that.

4

I do not agree with the Majority that, on remand, the circuit court should be required to hold a hearing and issue written findings and reasons for granting or denying the Second Class Motion. The requirements for a hearing and a written decision are set forth in Rule 2-231(d), which provides:

10

**Certification.** On motion of any party or on the court's own initiative, the court shall determine by order as soon as practicable after commencement of the action whether it is to be maintained as a class action. A hearing shall be granted if requested by any party. The order shall include the court's findings and reasons for certifying or refusing to certify the action as a class action. The order may be conditional and may be altered or amended before the decision on the merits.

In my view, under the plain language of this subsection, the hearing and written explanation requirements apply whenever the court decides to certify or not certify a case as a class action. This certainly applies to the court's initial decision, but it would also apply when the court reverses itself in either direction; that is, by certifying a class action after previously refusing to do so, or vice-versa. But the plain language does not require a hearing or written explanation if the court *declines* to reverse its initial decision. In that circumstance, the parties would have had a hearing if one was requested, and would have already received a written explanation of the court's decision granting or denying a class action motion. Declining to reverse the initial decision maintains the status quo, which requires neither a hearing nor a written explanation.

\*\*\*

Accordingly, I respectfully dissent to part II of the Majority's opinion. In all other respects, I join the Majority's opinion.

Senior Justice Harrell has authorized me to represent that he joins this opinion.

11